```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF OHIO
 2                        WESTERN DIVISION
                            -  -  -
 3
     UNITED STATES OF AMERICA,        :
 4                                    : CASE NO. 1:21-CR-0085
                      Plaintiff,      :
 5            vs.                     : SENTENCING HEARING
                                      :
 6   TRES GENCO,                      : February 29, 2024
                                      : 10:01 a.m.
 7                    Defendant.      :

 8                          -  -  -
                     TRANSCRIPT OF PROCEEDINGS
 9         BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE
                            -  -  -
10
     APPEARANCES:
11
     For the Plaintiff:
12                         Megan Gaffney-Painter, Esq.
                           Timothy S. Mangan, Esq.
13                         Assistant United States Attorneys
                           221 East Fourth Street, Suite 400
14                         Cincinnati, Ohio 45202

15   For the Defendant:
                           Richard W. Monahan, Esq.
16                         Federal Public Defender
                           250 East Fifth Street, Suite 350
17                         Cincinnati, Ohio 45202

18
     Also present:         FBI Special Agent Patrick Andrew Gragan
19                         Tres Genco, Defendant

20   Law Clerks:           Jennifer Johnson, Esq.

21   Courtroom Deputy:     William Miller

22   Stenographer:         Lisa Conley Yungblut, RDR, RMR, CRR, CRC
                           United States District Court
23                         100 East Fifth Street
                           Cincinnati, Ohio 45202
24

25
```

**Proceedings recorded in stenotype.**
**Transcript produced with computer-aided transcription.**

1  **<u>PROCEEDINGS</u>**

2  (Proceedings held in open court at 10:01 a.m.)

3  THE DEPUTY:  All rise.  This court is now in

4  session pursuant to the recess, The Honorable Judge Susan J.

5  Dlott presiding.  Please be seated.  *United States of*

6  *America versus Tres Genco*, Case No. 1:21-CR-85.

7  THE COURT:  Good morning to everyone.  Let me ask

8  counsel to please enter their appearances for the record.

9  Ms. Gaffney-Painter.

10  MS. GAFFNEY-PAINTER:  Good morning, Your Honor.

11  Megan Gaffney-Painter and Tim Mangan on behalf of the United

12  States.  And with us at counsel's table is Special Agent

13  Patrick Andrew Gragan with the FBI.

14  THE COURT:  How does he spell his last name?

15  MS. GAFFNEY-PAINTER:  G-R-A-G-A-N.

16  THE COURT:  Thank you.  Mr. Monahan.

17  MR. MONAHAN:  Good morning, Your Honor.  Richard

18  Monahan on behalf of the Defendant, Tres Genco, who is

19  seated present with me at counsel table in the custody of

20  the marshals.

21  THE COURT:  Thank you very much, Mr. Monahan.

22  And are you Tres Genco?

23  THE DEFENDANT:  Yes, Your Honor.

24  THE COURT:  And are you represented in this

25  proceeding by Richard Monahan, an attorney who's present

1    here in court with you today?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  On a former day, the Defendant pleaded

4    guilty to attempted hate crime.  At that time the matter was

5    referred to the United States Probation Department for a

6    presentence investigation and report.  The Court has

7    received the presentence report prepared April 27th, 2023.

8        The Court has also received and reviewed the following

9    documents relevant to sentencing:  The government's

10   sentencing memorandum filed on June 26th, 2023, which is

11   Document 67; the Defendant's sentencing memorandum filed

12   June 26th, 2023, which is Document 68; letters the Court

13   received on June 26th, 2023 from Tres Genco; Sarah Franks,

14   his mother; David Fulcher, the director of MANA, M-A-N-A;

15   Phillip Charles Nea, N-E-A; and Hung Phung, P-H-U-N-G.  The

16   Court has also received a psychological examination report

17   done on the Defendant on October 13th, 2023, which is

18   Document 69.

19       And the Court -- in addition to that, the Court has

20   also received Defendant's supplemental memorandum that was

21   filed November 3rd, 2023, which is Document 70; the

22   government's supplemental memorandum filed November 6th,

23   2023, which is Document 71; and, finally, the government's

24   second supplemental sentencing memorandum that was filed

25   yesterday, on February 29th, 2024, it's Document 73, and it

1    was filed at 9:12 p.m. last night; and the Defendant's

2    response to the government's second supplemental memorandum

3    filed on 2/29/24, which is Document 74, and that was filed

4    at midnight.

5        Counsel, I worked late yesterday afternoon and evening

6    to make sure that I had everything ready for the

7    sentencings, but I didn't exactly anticipate midnight

8    filings, but with the help of my law clerk, Jennifer

9    Johnson, I've been able to review them completely.

10       Any questions on that before the Court goes on?

11           MS. GAFFNEY-PAINTER:  Not from the government.

12   Thank you.

13           MR. MONAHAN:  No, Your Honor.

14           THE COURT:  Thank you.  Okay.  Defense counsel --

15   let me first then talk about the factual findings for

16   sentencing.  Defense counsel has put forth one objection and

17   numerous clarifications to the presentence report in this

18   case.  I'll ask counsel to address those objections

19   momentarily.  First, however, I would like to address the

20   factual findings for sentencing.

21       Before the Court accepts the presentence report as part

22   of the sentencing facts in this case and proceeds to address

23   any additional sentencing facts the parties wish to present,

24   I want to put on the record the Court's method for

25   determining a sentence.  This Court considers the factors

1    discussed in the Advisory Sentencing Guidelines along with

2    other factors, such as those contained in 18 United States

3    Code Section 3553(a), in arriving at a sentence.

4        Let me ask counsel, are any of the facts other than

5    those in the objections that are reported in the presentence

6    report disputed by the government or the Defendant, Ms.

7    Gaffney-Painter?

8            MS. GAFFNEY-PAINTER:  Not by the government, Your

9    Honor.

10           THE COURT:  Mr. Monahan?

11           MR. MONAHAN:  No, Your Honor.

12           THE COURT:  Okay.  Since you're seated at counsel

13   table, you can remain seated, if you would like, even when

14   you address the Court.  It's up to you.  If you feel you

15   have to stand, that's fine, but, otherwise, please feel

16   comfortable to stay seated.

17       Mr. Monahan -- let's see.  Mr. Monahan, did I ask you

18   about additional sentencing facts?

19           MR. MONAHAN:  You did, Your Honor, and I do not

20   have any.

21           THE COURT:  Okay.  All right.  And, Ms.

22   Gaffney-Painter, did I ask you about those as well?

23           MS. GAFFNEY-PAINTER:  You did, Your Honor.

24           THE COURT:  Okay.  All right.  Then, there being no

25   objections other than those previously mentioned to the

1    factual statements contained in the presentence report, the

2    Court adopts those statements as its finding of fact.  The

3    Defendant has entered a valid plea to Count 1 of the

4    indictment.  Accordingly, the Defendant is adjudged guilty

5    in Case No. 1:21-CR-85 of attempted hate crime.  Pursuant to

6    18 United States Code Section 3553(a) and C, the Court makes

7    the following findings of relevant facts significant to the

8    imposition of sentence.

9         The Defendant is guilty of violating 18 United States

10   Code Section 249(a)(2) and (a)(2)(A)(ii)(II), a Class A

11   felony, which subjects the Defendant to up to life

12   imprisonment, a fine of up to $250,000, a period of

13   supervised release of up to 5 years, restitution, and a $100

14   special assessment.

15        Next, I'd like to deal with the issue of objections.

16   The Court has already issued a written ruling on Mr. Genco's

17   objection to the calculation of his base offense level.  Are

18   there any other objections to the presentence report that

19   have not been previously raised?

20            MR. MONAHAN:  No, Your Honor.  Given the Court's

21   presentence written ruling regarding our objections, which I

22   think we, both parties, briefed adequately and preserved any

23   issues related to, we have no additional issues to raise as

24   far as objections.

25            THE COURT:  Thank you, Mr. Monahan.

1      Ms. Gaffney-Painter?

2          MS. GAFFNEY-PAINTER:  That's a correct summary,

3   Your Honor.

4          THE COURT:  Okay.  Thank you.  Then, the Court

5   notes that there are no additional objections from either

6   the Defendant or the government as to the application of the

7   guidelines or the facts contained in the presentence report.

8      Let me go over with you what the suggested federal

9   sentencing guidelines are.  Mr. Genco pled guilty to

10   attempted hate crime in violation of Title 18 United States

11   Code Section 249(a)(2) and (a)(2)(A)(ii).  In accordance

12   with the provisions of Title 18 United States Code

13   Section 3553(c), the Court places on the record the

14   following statement of reasons.

15      The applicable Sentencing Guidelines Manual is the 2023

16   edition.  I know that the original presentence report used

17   the 2021 edition, which was in effect at the time the

18   presentence report was written, but the Court has conferred

19   with Ms. Connerty of the probation department who was the

20   author of that report, and the 2023 edition would not make

21   any changes.

22      The guideline for a violation of 18 United States Code

23   Section 249(a)(2) and (a)(2)(A)(ii) is Sentencing Guideline

24   Section 2H1.1.  Pursuant to Subsection (a)(1), the offense

25   level is the level from the offense guideline applicable to

1    any underlying offense.  Application Note 1 instructs,

2    quote, "the offense guideline applicable to any underlying

3    offense," unquote, means the offense guideline applicable to

4    any other conduct established by the offense of conviction

5    that constitutes an offense under federal, state or local

6    law other than an offense that is itself covered under

7    Chapter 2, Part H, Subpart 1.  The offense of conviction is

8    attempted hate crime, and the subject -- and, I'm sorry, and

9    the subsection the Defendant pled guilty to includes an

10   attempt to kill; therefore, the underlying offense is

11   attempted murder.  Sentencing Guideline Section 2A1.2

12   references assault with intent to commit murder slash

13   attempted murder and was utilized to determine the base

14   offense level.

15        Sentencing Guideline Section 2A1.2(a)(1) instructs the

16   base offense level is 33 if the object of the offense if

17   carried out would have constituted first degree murder.

18   Application Note 1 defines first degree murder as the

19   conduct defined in 18 United States Code Section 1111, which

20   identifies murder as the unlawful killing of a human being

21   with malice aforethought, which is also called

22   premeditation.  As Mr. Genco planned to kill women, which

23   included writing about the killing and planning the killing,

24   the base offense level is 33.

25        Sentencing Guideline Section 3A1.1(a) instructs that a

1    three-level increase is appropriate if the Court at

2    sentencing determines beyond a reasonable doubt that the

3    defendant intentionally selected any victim or any property

4    as the object of the offense of conviction based on the

5    actual, real or perceived race, color, religion, national

6    origin, ethnicity, gender, disability or sexual orientation.

7    Mr. Genco initially selected women as victims of his

8    offense; therefore, three levels are added.  That makes the

9    adjusted offense Level 36.

10        Pursuant to Sentencing Guideline Section 3E1.1(a) and

11   (b), the offense level is decreased by three levels because

12   Mr. Genco accepted responsibility for his role in the

13   offense and entered a timely plea.  The total offense level

14   is 33.

15        The Court finds the defendant has zero criminal history

16   points, which establishes a criminal history category of

17   Roman Numeral I.  Based on a total offense level of 33 and a

18   criminal history category of Roman Numeral I, the guideline

19   imprisonment range is 135 to 168 months, which falls in Zone

20   D of the sentencing table.  Because the guideline range of

21   imprisonment falls within Zone D of the sentencing table,

22   the minimum term shall be satisfied by a sentence of

23   imprisonment.  A sentence of probation is not authorized

24   pursuant to Sentencing Guideline Section 5B1.1, Comment Note

25   2.  The authorized term of supervised release is at least

1    two but not more than five years pursuant to Sentencing

2    Guideline Section 5D1.2(a)(1).  There is a $100 special

3    assessment which is mandatory.  The guideline range for a

4    fine is from 35,000 to $250,000 according to Sentencing

5    Guideline Section 5E1.2(c)(3).  Restitution is not

6    applicable.

7         And, Mr. Genco, I failed to say at the beginning of the

8    hearing, if there's anything that I say that you don't

9    understand, please know that you can take time to ask Mr.

10   Monahan to explain it to you or ask the Court to repeat it,

11   that would -- that's perfectly fine with the Court.

12        Next, then, the Court would like to address the

13   sentencing factors under 18 United States Code

14   Section 3553(a).  Pursuant to 18 United States Code

15   Section 3553(a), when imposing sentence, the Court must

16   consider the history and characteristics of Mr. Genco, the

17   nature and circumstances of the offense, the need to protect

18   the public from future crime on the part of Mr. Genco,

19   general deterrence, and the need to provide a punishment

20   that is sufficient but not greater than necessary to achieve

21   the goals of sentencing.

22        The offense conduct here is very serious.  Mr. Genco

23   pled guilty to an attempted hate crime.  Hate crimes can

24   range in severity, and this is one of the most serious ones

25   the Court has ever had.  Mr. Genco admitted in the statement

1    of facts to his plea agreement that his conduct included,

2    quote, "an attempt to kill women through the use of a

3    firearm and a dangerous weapon," unquote, and that he,

4    quote, "formulated a plot to kill women and intended to

5    carry it out," unquote.  He admits that he was a member of a

6    radicalized group, the incel movement, which harbors hatred

7    and espouses violence towards women for failure to engage in

8    sexual activity with its members.

9        Mr. Genco's guideline range is high here because we are

10   looking at the underlying conduct of attempted murder.  What

11   troubles me in this case is that, in addition to his

12   admission of an attempt to kill and intention to carry that

13   out, Mr. Genco took some very specific and what I consider

14   to be escalating steps to go through with this plot.  The

15   probation officer outlined this conduct in the presentence

16   report and I'm going to highlight some of that.

17       And I just want to thank the probation officer on the

18   record for doing such an excellent job on this presentence

19   report.  I know it was difficult, Ms. Connerty, and I really

20   appreciate all of your hard work.

21       From January 2019 to his arrest on March 12, 2020, Mr.

22   Genco was a member of the incel movement.  He wrote about

23   conducting a shooting suggested -- suggesting in one note

24   that KC, or kill count, needed to be big, quote, 3,000,

25   unquote.  He wrote about obtaining military training to

1    further this goal and, in fact, did obtain some basic

2    training, ultimately being discharged from the military.  He

3    also wrote about his desire to murder women in disturbing

4    writings signing one note, quote, your hopeful friend and

5    murderer, unquote.

6        He conducted concern -- he conducted concerning

7    internet searches.  Among the topics searched were for

8    sororities and a university in Ohio.  He researched gun

9    modifications and saved illustrated guides for the

10   construction of M-16s.  He searched the internet for a

11   variety of related topics, including planning a shooting

12   crime, quote/unquote.  Shortly before his arrest, he

13   conducted an internet search of police scanner codes for

14   Columbus, Ohio and university police agencies.  He acquired

15   an AR-15 rifle modified with a bump stock, loaded magazines,

16   body armor, and boxes of ammunition.  When he was arrested,

17   these items were in the trunk of his car.  Officers also

18   located a handgun that was hidden in a vent in his bedroom.

19       Mr. Genco had the means and apparently the desire to

20   follow through with this horrible plan.  This is not a

21   standard attempted hate crime.  The underlying conduct here

22   is very serious.  And what I keep going back to is that, Mr.

23   Genco, you admitted that you had a plan to kill women and

24   you intended to carry that out.  Thankfully, your plans were

25   thwarted by the interference of law enforcement.

1        As to the history and characteristics of Mr. Genco, the

2    instant offense represents Mr. Genco's first interaction

3    with the criminal justice system.  He was sentenced to a

4    17-month term of imprisonment out of Highland County Common

5    Pleas Court for behaviors considered relevant conduct.  Mr.

6    Genco was raised in a chaotic and highly dysfunctional

7    environment.  He stated his mother provided adequate food,

8    shelter, and clothing; however, she struggled with

9    significant mental health issues which adversely impacted

10   his childhood.  He described that his mother suffered from

11   mental illness and pain pill addiction.  She was verbally

12   abusive and controlling.  Her behaviors towards Mr. Genco

13   caused him to suffer from depression and social anxiety.

14   Mr. Genco noted he has worked on his social anxiety in the

15   Butler County jail and has benefitted from the services he

16   has received.

17       Mr. Genco also suffers from mental health issues.  The

18   Court ordered a psychological evaluation in this case prior

19   to sentencing, which it has reviewed along with his prior

20   evaluation.  The government argues that the recent report

21   was incomplete and that the doctor's risk assessment scores

22   are inaccurate.  The doctor who examined Mr. Genco most

23   recently determined that he suffers from Bipolar 1 disorder

24   and alcohol use disorder.  That doctor indicated that, if

25   Mr. Genco abstains from alcohol use, which was a maladaptive

1   attempt to cope, and maintains psychiatric stability, which

2   is possible with treatment and monitoring, his risk of

3   violence is low.  Mr. Genco, I recommend that you obtain

4   mental health counseling and alcohol abuse treatment while

5   in custody.

6        In addition, I note that your lawyer asserts that you

7   have abandoned the incel movement and no longer identify

8   with those views; although, the government disputes this.

9   If you have left this radical belief system, that is a very

10  positive development in your rehabilitation.

11       Mr. Genco has a history of employment; however, he

12  could benefit from vocational training or an apprenticeship

13  program.  Mr. Genco does not have any medical needs that

14  require treatment, except for possibly psychological drugs.

15  He requested a dental visit for a routine cleaning and

16  check-up.

17       He is not married and does not have any children.  He

18  hopes to have children in the future.  Mr. Genco received a

19  high school diploma through California and has attended some

20  college.  He plans to return to college and achieve a

21  degree.  He is 24 years old.

22       The need to protect the public from future crimes of

23  Mr. Genco is high in this case given the severity of the

24  underlying conduct.  Without the involvement of law

25  enforcement, the outcome of this case could have looked a

1       lot different.  Here, the Court must not only deter

2       attempted hate crimes, but also gun violence and attempted

3       murder.  Protecting the loss of innocent lives is a huge

4       priority in this case and one the Court takes very

5       seriously.  Based on the Court's limited knowledge of mass

6       shooting, oftentimes, we don't get the opportunity to

7       intervene.  I am incredibly grateful that the opportunity to

8       intervene occurred here.  However, the sentence reflects the

9       severity of the underlying conduct here and the desire to

10      protect the public from future crime.

11          Mr. Genco, I am taking into account that you've had

12      some challenges in your life, including your mental health

13      and upbringing.  Given that you have suffered from a highly

14      dysfunctional childhood and that you, yourself, suffer from

15      serious mental health issues, the Court finds that a

16      variance is warranted.

17          However, Mr. Genco, you are still looking at a

18      significant sentence.  I hope that the sentence in this case

19      allows time such that, when you do get released, you can

20      become a productive member of society.  If you take the

21      doctor's report at face value, Mr. Genco, if you can stay in

22      treatment and take your mental health seriously, the doctor

23      believes that you can be a productive member of society when

24      you are released.  We all want that for you, not just for

25      your own health, but for the health and safety of the

1    community as well.

2         Mr. Genco's total offense level is 33 and his criminal

3    history category is I, which results in a guideline

4    imprisonment range of 135 months to 168 months.  The parties

5    have agreed upon a sentence in this case that Mr. Genco

6    shall serve up to 150 months in prison.  Restitution is not

7    an issue in this case.

8         Any questions before I go on further?

9         MS. GAFFNEY-PAINTER:  Not from the government.

10   Thank you.

11        MR. MONAHAN:  No, Your Honor.  Thank you.

12        THE COURT:  All right.  An ongoing concern to me in

13   this case is avoiding sentencing disparities.  With over

14   27 years on the bench, I have sentenced many defendants, and

15   Mr. Genco's guideline range has jumped out at me as being

16   particularly high.  By applying the cross-reference to

17   murder, Mr. Genco's guideline range jumps significantly.

18   When I look at other similarly situated defendants who have

19   threatened serious violence motivated by hate or other

20   factors, their sentences have been lower, but their conduct

21   is equally, if not more so, dangerous or reprehensible.  I

22   understand that Mr. Genco was prosecuted under the Hate

23   Crime Act and admitted to conduct including a threat to kill

24   women.  I do not take this lightly.  But when I look at

25   similar prosecutions involving threats of violence which

1   vary factually on the way they are charged, Mr. Genco's

2   sentencing range is disparate from those sentences.

3       In the case of *United States versus Michael Chan*, which

4   was Case No. 1:17-CR-108, which was my case, the defendant

5   was convicted of cyber stalking for repeatedly harassing a

6   female victim for years with threatening text messages and

7   packages.  The harassment involved Mr. Chan anonymously

8   calling and texting the victim for several years, sending

9   deliveries and subscriptions to her home, and sending items

10  to a local news media stating that a subject was driving

11  from Canada to Cincinnati to sexually assault and murder the

12  victim.  The victim received harassing and threatening

13  e-mails which she reported to authorities.  The threat

14  escalated when Mr. Chan sent a text message to a local

15  detective working on the case indicating he was going to

16  visit the victim and there was nothing law enforcement could

17  do about it.  He also indicated he was coming to Cincinnati

18  to attack the victim on the campus of the University of

19  Cincinnati.  Mr. Chan was sentenced to 37 months

20  imprisonment.

21      In the case of *United States versus Izmir Koch*, which

22  was case 1:18-CR-34, which was also my case and actually a

23  trial that involved Ms. Gaffney-Painter, the defendant was

24  convicted of committing a hate crime for randomly attacking

25  a perceived Jewish person, fracturing his face and ribs,

1   threatening to slaughter, slice and kill Jewish people.  The

2   defendant requested an innocence proffer through counsel

3   leading him to lie to federal officials resulting in a

4   prosecution for making a false statement to federal law

5   enforcement.  The defendant was convicted of the charges at

6   trial and sentenced to 30 months of imprisonment.

7       In *United States versus Samuel Whitt*, which was Case

8   No. 1:17-CR-60 -- which was not my case, but Judge Michael

9   Barrett's, my colleague -- the defendant was convicted of

10  criminal interference with the right to fair housing.

11  Mr. Whitt admitted in his plea agreement that he used force

12  to intimidate and interfere with Victim A, an African

13  American male, and Victim B, a white female, because of

14  Victim A's race and the two victims' marital status and

15  because the victims rented and contracted and negotiated for

16  the rental of a home in Price Hill, Cincinnati, Ohio.  He

17  did so, in part, by attempted arson.  After his eviction by

18  Victims A and B, Mr. Whitt broke into the Price Hill

19  property and threw paint on the walls, stairs, and

20  appliances, poured Quikrete into the drains and toilet,

21  spray painted messages on the walls, including quote, die

22  Nigger, unquote; quote, slum lord, unquote; and swastikas,

23  among other things.  He also attempted and threatened to

24  cause a fire inside the house.  He was sentenced to

25  54 months of imprisonment.

1        Finally, and perhaps most troubling to me, is the

2    currently pending case of *United States versus Alex Jaques*.

3    It's spelled J-A-C-Q-U-E-S.  It is Case No. 3:22-CR-143, and

4    it is currently pending before Judge Rice in Dayton.  This

5    case is most factually similar to Mr. Genco's case but,

6    arguably, worse.  This defendant is awaiting sentencing, and

7    the facts in this case are disturbing with the defendant

8    threatening violence on a mass scale against children and

9    being in possession of significantly more weapons than Mr.

10   Genco.  The parties have entered into a Rule 11(c)(1)(A)

11   plea agreement in which Mr. Jacques pled guilty to

12   possession of a machine gun with a recommended advisory

13   sentence of 30 to 37 months.

14       In his statement of facts, Mr. Jacques admits operating

15   a YouTube channel entitled, quote, Guns and Film, unquote,

16   on which he posted a number of videos about firearms.  On

17   September 30th, 2022, he posted a video entitled, quote,

18   Torture Testing a Chromebook, paren, Washington Middle

19   School, unquote.  In the video, he shows a Google Chromebook

20   with a Washington Middle School sticker prominently

21   displayed on it lying on a bed in a bedroom with the camera

22   focused on the laptop.  He says, quote:  Hello, guys, we are

23   going to be torture testing a Washington Middle School

24   Chromebook, yea, Washington Middle School Chromebook from

25   Salinas, California, where I plan to eventually return and

1    fill out my list of duties that I have filled out with names

2    and addresses of people who have wronged me throughout the

3    years anyways, SUHSD, which stands for the name of the

4    school.  That's Salinas Union High School District.  He

5    stabs the laptop multiple times with a screwdriver.  Two

6    separate firearms are visible in the bedroom.  He picks up

7    the third firearm.  He then picks up a power drill and uses

8    the drill on the laptop.  He moves to the basement and the

9    camera shows a view of a table on which two firearms are

10   visible.  He props the laptop up on a stand in the basement

11   and states:  Yeah, okay, so Washington Middle School, you

12   are next, and fires a single shot at the laptop, which

13   appears -- with what appears to be a handgun.  He then picks

14   up a 9-millimeter Luger Uzi-style submachine gun and fires

15   multiple shots in rapid succession at the laptop.  He later

16   files a -- I'm sorry, fires a rifle several times at the

17   laptop.  The school named hired armed security guards after

18   the administration learned of Mr. Jaques' video.  Mr. Jaques

19   made other posts online, including a comment on line about

20   quote, doing his own Parkland, unquote.  When law

21   enforcement searched his home, they found an arsenal of

22   weapons and devices, including a 9-millimeter Luger

23   Uzi-style submachine gun depicted in his video, several

24   other firearms, ammunition, suppressors, a grenade and

25   grenade fuses, large quantities of ammunition and gun

1    powder, along with other items.

2        Mr. Jaques faces a sentence of 30 to 37 months with the

3    possibility of the judge imposing a greater sentence.  Of

4    course, he has not been sentenced yet, but this is quite a

5    difference from Mr. Genco's sentencing range.

6        Defendants in our district who threaten violence

7    against innocent victims, be it children or women, should be

8    treated similarly here in this district.  In fashioning Mr.

9    Genco's sentence, I am striving to avoid these kinds of

10   unwarranted sentencing disparities.  Mr. Genco's conduct is

11   very serious.  These other defendants' conduct was very

12   serious too.

13       There are not a lot of defendants that are sentenced

14   under Sentencing Guideline Section 2H1.1 who fit the same

15   criminal history category and offense level as Mr. Genco.  I

16   reviewed the United States Sentencing Commission's website,

17   which is called -- which goes by the acronym JCIN, which

18   stands for the Judiciary Sentencing Information Site --

19   which gives statistical information about federal defendants

20   and the sentences received within the last five years.  I

21   know there was a criticism in the government's memo last

22   night about the Court limiting its comparisons to local

23   cases, so the Court went to JCIN, the United States

24   Sentencing Commission's website, to see what national

25   sentencings were.

1       When I enter 2H1.1, Criminal History Category I and

2   Offense Level 33, there's not enough data for the site to

3   provide statistics; that's how few comparators we have here.

4   However, looking around at similar criminal histories, I see

5   a trend of departures.  For defendants with an offense level

6   of 32, which is only one point below the defendant in this

7   case, four defendants were sentenced between 2018 and 2022

8   and 100 percent of them received a downward departure or

9   variance with an average length of imprisonment of 71 months

10  and with a median length of 80 months of imprisonment.

11      For defendants with an offense level of 31, eight

12  defendants were sentenced between 2018 and 2022, and

13  44 percent received a downward departure with an average

14  sentence of 90 months' imprisonment and median sentence

15  length of 93 months of imprisonment.

16      The Court finds that a variance is warranted in this

17  case due to -- I'm sorry.  I find that a variance is

18  warranted in this case to avoid unwarranted sentencing

19  disparities.

20      Let me ask counsel, do you have any questions about the

21  statutory provisions applicable to the imposition of

22  punishment in this case or the suggested sentencing

23  guidelines, Ms. Gaffney-Painter?

24          MS. GAFFNEY-PAINTER:  Your Honor, I don't have an

25  objection to the summary of the statutory provisions that

1    apply here.  But some of the Court's conclusions suggested

2    in its colloquy, the government would take issue with but

3    intends to address that in argument.

4              THE COURT:  Thank you.  Mr. Monahan?

5              MR. MONAHAN:  No, Your Honor.

6              THE COURT:  All right.  Then, we'll now proceed to

7    the sentencing, and at this time, the Court will entertain

8    anything the parties wish to say in mitigation or

9    aggravation of sentence.  Mr. Monahan.

10             MR. MONAHAN:  Yes, Your Honor.  With your

11   permission, it probably would be easier for me to be at the

12   podium.

13             THE COURT:  Whatever you would like to do, Mr.

14   Monahan.

15             MR. MONAHAN:  I'm going to let Mr. Genco remain

16   seated, if that's okay.

17             THE COURT:  That's fine.

18             MR. MONAHAN:  I might want to use the visualizer.

19   I can just slide it out?  Okay.  Thank you.

20        As I know you're aware, Mr. Genco has been subjected to

21   two prosecutions for his conduct.  We're going to ask you to

22   seriously consider how the 3553 factors deal with this kind

23   of situation, and specifically two that I generally don't

24   talk about that much, and that is promoting respect for the

25   law, which is one the primary considerations, and

1    providing just punishment.  I know we talk a lot about

2    punishment, but this really seems to focus us in on the word

3    on what is "just punishment" under the statute.

4        We're going to submit to you today that the way this

5    second prosecution has happened is broken.  It is an example

6    of how the system is broken when we have prosecutions by two

7    different jurisdictions for the same thing.  And I want to

8    talk first about the state court proceedings, and I know

9    you're aware that that happened, but I think it's important

10   to actually really consider this as we look at the factor

11   promoting respect for the law.

12       As you know, Mr. Genco committed this offense.  He was

13   arrested March 12, 2020, and that is the day he went into

14   custody.  You've heard a lot about that.  That happened up

15   in his county in Hillsboro.  The local police arrested him

16   and he was taken into custody, and he was charged with

17   making a terroristic threat, and it relates to not just

18   relevant conduct, but the exact identical conduct that we

19   are still talking about today years later.  He was charged

20   with making a terroristic threat.  He was appointed counsel.

21   He was held in custody.

22       At the time of the charge, it was a felony of the third

23   degree in Ohio and that case proceeded.  They got discovery.

24   They obtained his phones, his electronic devices; they did

25   forensics on them.  They built a case.  The defense attorney

1    had him psychologically evaluated during the course of that

2    case.  I think the Court has now seen and referred to that

3    state psych eval, and, ultimately, that case ended in a plea

4    agreement.  It took six months to get to sentencing.  So

5    between March when he was arrested of 2020 and September of

6    2020, that state case reached a conclusion.  That's a decent

7    amount of time for a state case, it took six months to get a

8    resolution.

9        He pled guilty pursuant to a plea agreement in that

10   case to attempted making a terroristic threat as a felony of

11   the fourth degree.  As I think we all know, that carries up

12   to 18 months in state court, between 0 and 18 months.  The

13   judge on that case, Judge Coss -- who by the way was a trial

14   judge who had been on the bench for over a decade at this

15   point.

16            THE COURT:  A child.

17            MR. MONAHAN:  Pardon?

18            THE COURT:  He's a child compared to me.

19            MR. MONAHAN:  Relatively speaking, but still no

20   inexperienced judge.  He took a look at the case.  He had

21   all of the evidence before him.  He heard from both sides.

22   He had a psych report.  It was a fair six-month process, and

23   the judge gave him not even the maximum sentence that he had

24   available.  The maximum sentence would have been 18 months;

25   that Judge gave him 17 months.

1           So in September of 2020, my client is sentenced after a

2      fair state proceeding in which he pled guilty.  That should

3      have been the end of this matter.  There's never been a

4      single question or allegation there was anything unfair

5      about that proceeding, that sufficient information wasn't

6      provided during that proceeding, and I think societally, we

7      expect that to be a final judgment.

8           And when we start thinking about promoting respect for

9      the law, isn't this one of the things that that means?  You

10     get charged, you get counsel, you engage in negotiations and

11     discussions about discovery, you reach a resolution, and it

12     is done.  And you know that when you are sentenced, you will

13     do the time you are required to do, you will do your

14     rehabilitation, and you will come back into the community a

15     better citizen for it, hopefully.  But that is not what

16     happened in this case.

17          Mr. Genco goes off to prison to do his sentence, state

18     prison now, and keep in mind this is COVID era.  And I point

19     out in our sentencing memo, this was no easy jail sentence

20     for him.  He's on lockdown.  You may recall this is the

21     height of COVID problems in jails.  He does his time with

22     the State of Ohio, and he is released February 23rd, 2021,

23     released from prison.  He goes to stay at the Alvis halfway

24     house.  He is assigned a case manager who he is working

25     with.

1          He gets employment.  And this is all in our sentencing

2     memorandum.  He starts at the Tumbleweed restaurant.  He is

3     a server, a busser, not what he envisioned being his

4     life-long career, but it is work he got coming right out of

5     prison.  He worked there for a couple of months and then got

6     himself a better job at Candle-lite in Williamsburg, Ohio,

7     making candles.  He enjoyed it.  It was good work.  He was

8     making $18 an hour at that point.  He continued working at

9     Candle-lite through the summer until July of 2021.  At this

10    point, he has been out for five months after serving his

11    sentence, living in a halfway house, rehabilitating,

12    working, seeing a case manager, being a productive citizen.

13         There has not been a single suggestion in the PSI, from

14    the government, any police report anywhere that during this

15    time he had finished his sentence, he was having bad

16    behavior, bad thoughts, bad writings, nothing.  He's just

17    productive.  He's done his time.  He's learned his lesson,

18    and he's on track.  This is promoting respect for the law.

19    He's out.  This is providing just punishment.  He's doing

20    what he's supposed to be doing.

21         But what happens instead?  Instead, in July of 2021,

22    five months after my client was released from prison, the

23    Feds charge him with this case and an indictment.  He is

24    arrested the very next day, goes into custody on July 21st

25    of 2021.  He is arrested at the Alvis House where he is

1    living.  The government is now seeking a sentence that is

2    nine times longer than what he received for the exact same

3    conduct in state court.  How can this conceivably under any

4    broken sense of justice promote respect for law?

5        I wanted to ask why did this happen, but really the

6    better question is:  How does this promote respect for the

7    law?  How under any ill-conceived sense of justice does this

8    promote respect for law?  How is this just in a system that

9    is supposed to be the world's best in delving out justice

10    and punishment to defendants?  It is simply not fair, Judge.

11    It is not a fair way of proceeding in criminal prosecutions.

12        Now, I understand, and I'm sure the government can

13    point out, the Supreme Court has held the double jeopardy

14    clause does not prohibit them from doing this, we know this,

15    but it also doesn't encourage them to do this.  I mean, does

16    the constitution encourage them to second guess state

17    prosecutions; is that the point of federal prosecutions,

18    second-guessing what's already been done in a fair

19    even-handed state criminal prosecution?  We submit it is

20    not, it is not what the government should be doing with its

21    time.

22        So as you consider promoting respect for the law, we

23    simply ask that you consider these factors.  On top of the

24    state sentence, Mr. Genco has now sat in custody for another

25    two-and-a-half -- just over two-and-a-half years.  He went

1     into custody July of 2021 and here we are February 29th,

2     2024.  So in addition to the state sentence he had already

3     served, he has now served another two years, I think, and

4     seven months, is where we are.

5          It appears the government's position is the state got

6     it wrong and we need to fix it, but that certainly is not

7     how the justice system is supposed to work.  So as we look

8     forward and I submit to you -- and I think the Court may

9     have some feelings about this already -- but this offense

10    Level 33 for this offense shows how these guidelines are

11    broken for this crime, especially when you consider what

12    these other defendants have received for similar and I think

13    often more egregious conduct.  It's broken.  This is a

14    broken guideline system, that this is where Mr. Genco ends

15    up.

16         And as I'm looking at these other sentences that you

17    mentioned -- and I explained this in the sentencing memo --

18    it seems to me that there's a spectrum of offenses.  There

19    are people who have actually committed a violent offense and

20    then there are those who have threatened or attempted to

21    commit an offense, and certainly that's two different groups

22    of people, and that's a spectrum.  You know, I'm a guy who

23    thought about it, I'm a guy who planned it, I'm a guy who

24    attempted to do it; and I'm a guy who did it.  Okay.  This

25    is a spectrum of conduct.

1       My guy has pled guilty, and nothing I said today will

2   take away from the fact that this man, from day one, all he

3   has wanted to do is plead guilty to this crime.  And we get

4   caught up legally what is an attempt and what is not an

5   attempt and this has been from an attorney perspective a

6   tricky case to put one's thumb on; but, nonetheless, he has

7   always wanted to accept his responsibility, and that's what

8   he has done and that's what he is doing fully today,

9   accepting responsibility for where he was.

10      But I want to say this, when we look at these other

11  cases that you mentioned and the Court already summarized,

12  I'm going to hit a couple high points.  I was going to do a

13  more thorough summary, but you really hit what I was going

14  to say.  If we look at two defendants which you mentioned,

15  first the Koch, K-O-C-H, case, which you had, here's a

16  defendant that committed a violent offense, this is a person

17  that actually did it.  And I was actually reading the

18  government's sentencing memorandum in that case that he

19  comes out of a restaurant and is yelling how he hates Jewish

20  people and wants to slaughter them, those are his words.  He

21  demands to know who present is a Jewish person, and he

22  encounters who you know is the victim -- I know you heard

23  that trial -- punches him twice in the back of head.  The

24  guy falls to the ground.  The defendant and his friends

25  continue to assault, kick, and punch this victim laying in

1   the parking lot.  His fiancee attempts to intervene.  The

2   men who are beating her husband threw her to ground like a

3   rag doll, is what the government wrote, while she screamed.

4   It was only a friend of the victim who was able to intervene

5   and stop that defendant from beating this man, who knows how

6   badly, I mean, it was stopped, but what if the friend hadn't

7   intervened, he might have beat the guy to death, for all we

8   know.  Does it get more serious than that?  He wasn't done,

9   though, with the beating, because then he proceeded to run

10  around the parking lot screaming:  If I had a knife, I would

11  cut a Jew.  So, you know, here we have a guy that went all

12  the way and beat someone, perhaps what would have been

13  significantly worse if not stopped, and as you pointed out,

14  that guy got 30 months, 30 months in jail.  My client has

15  already served more than 30 months in jail.

16      One case we didn't mention because I know it wasn't in

17  my sentencing memorandum, but Mr. Johnson, who pled guilty

18  before you yesterday, I know you're very familiar with it,

19  I'm just going to mention it.  Mr. Johnson beat an Asian

20  person at University of Cincinnati, a student who was simply

21  walking down the street.  He beat him yelling out racial

22  slurs.  He also was pulled off of that victim by other

23  students in the area.  We don't know how bad that would have

24  gotten had they not done that.  Mr. Johnson has an agreed

25  sentence of not more than 22 months.

1       So those are two cases where actual violence was

2   committed, which again is not Mr. Genco.  We have Mr. Whitt,

3   which you mentioned, I think Mr. Whitt is an interesting

4   case, and he's a defendant who put racial slurs all over the

5   African American man's apartment home.  This defendant --

6   and I think you pointed out all of the facts -- I wanted to

7   remind you is more than just an attempt at arson.  This

8   defendant went in, put the gas on the stove, lit a candle

9   next to it and ripped out the smoke alarm.  I think it

10  sounds like it was just happenstance that that didn't kill

11  people.  It certainly sounds like it was the intention, that

12  in addition to the knife that the defendant stuck in the

13  floor of that apartment.

14      And that was a civil rights violation case by force and

15  threat of force, attempted to, and did, willfully injure,

16  intimidate, and interfere with Victim A and Victim B.  That

17  was what the charge said.  He pled guilty to the civil

18  rights violation, got 54 months in prison, $66,000 in

19  restitution that defendant caused.  And I think you pointed

20  out all of the other inflammatory stuff about him, although,

21  I would point out he also had a prior conviction for racial

22  intimidation, painting swastikas and things on churches and

23  schools.

24      So again, when we're comparing these cases -- and I

25  know the government has attempted to minimize the

1    seriousness of them, they certainly didn't at the time that

2    they were prosecuting these people, and that's some of what

3    we're pointing out today and in our memorandum.  At the

4    time, these were Public Enemy No. 1.  Mr. Whitt got the

5    longest sentence of anyone at 54 months, which I think

6    you've already pointed out.

7        The threat cases, Mr. Chan, I know you handled that

8    case, that was 37 months, and you did a very thorough job of

9    summarizing everything he did.  I would remind you he also

10   threatened shootings at UC and bombing at the university, so

11   it wasn't just threatening that woman.  He threatened

12   broader attacks.  He also harassed the police at one point,

13   even ordering pizza to the police department because he just

14   continued to taunt them that they could never catch him over

15   the course of six years.  37 months.

16       Mr. Jacques I think you've covered very thoroughly.

17   And I submitted a memorandum last night detailing the

18   government's sentencing memorandum in that case, which is

19   actually hard to read because there's so much violence and

20   there's actually sex offense allegations against I believe

21   his sister and it goes on and on.  So as you pointed out,

22   the government agreed to a guideline range in that case of

23   30 to 37 months.  I submitted you the entire sentencing

24   memorandum the government submitted in that case.  There was

25   no request for an upward departure or variance.

1          Finally, the last case I want to mention is the

2     *Ferguson* case.  This was a Sixth Circuit decision on

3     attempted kidnapping.  And I did spend a good deal of time

4     talking about this case related to Mr. Genco's case in our

5     sentencing memorandum, so I won't rehash everything we've

6     said in that case.  But in Ferguson, the defendant in that

7     case, I would submit to you, was really further down the

8     line toward committing a crime than Mr. Genco.  That

9     defendant went to trial.  And this -- just for the record, I

10    know I've cited it, it's *United States versus Ferguson*, 65

11    Fed 4th 806, a published decision from the Sixth Circuit,

12    April 20th, 2023.

13         Mr. Ferguson was planning a kidnapping.  He had a

14    firearm, an AR-15 rifle.  He had created an online group,

15    you know, those state militia people who are very violent.

16    They had created a name for themselves.  They had created an

17    online group.  His plan was to lure law enforcement

18    officials to a remote location under a ruse of having a

19    female pretend to be in a domestic violence situation,

20    kidnap them, strip them, take their weapons for their own

21    use and send them on their way as kind of a calling card to

22    law enforcement as to how bad these people were.  This is a

23    plan in the kidnapping.  They got as far as actually going

24    out to a remote house and doing a practice call to see how

25    quickly law enforcement would show up for their future

1   planning of this offense.  That defendant -- however, there

2   was an undercover FBI agent working in his group of people

3   and they arrested him that day and charged him with

4   attempted kidnapping.  So the importance of all of this is

5   look how far down the line this guy got, he actually phoned

6   law enforcement to test how quickly they would come to a

7   location for the kidnapping.

8        Importantly, the Sixth Circuit holds in a published

9   decision -- and this is after our proceedings were

10  already -- we've already pled and already awaiting

11  sentencing.  They hold that that was not even an attempt

12  under federal law, not even an attempt.  And they focus on a

13  couple of things I want to just read you directly from the

14  Sixth Circuit decision.  Preliminary or planning activities

15  are not -- and this is this case at page 812 in the

16  decision.  The Sixth Circuit, preliminary or planning

17  activities are not sufficient to constitute an attempt.  A

18  fragment of the crime must essentially be in progress.  The

19  purpose of the substantial step requirement is to ensure

20  against the danger of convicting for mere thoughts, desires

21  or motives.

22       The Sixth Circuit says:  Ferguson's plan was to conduct

23  this raid on a law enforcement officer more than a month in

24  the future.  The government pointed us to no Sixth Circuit

25  case in which an attempt conviction was predicated on a plan

1    as far in the future as Ferguson here.  I struggle to find

2    out that's different than our case, I really do.

3        Now, my client pled guilty and is admitting guilty to

4    committing an attempt.  But when you consider the degrees of

5    seriousness of crimes -- this is what I'm wanting you to

6    look at -- is we have again people with plans, people who

7    attempt, people who commit violent crimes.  Where is he on

8    the spectrum, how far along the line is he?  The Sixth

9    Circuit says:  The possibility of committing this crime more

10   than a month in the future.  The government has not shown us

11   a single case where that constitutes an attempt.  We know

12   what attempts are.  I've got a gun, I'm on my way to the

13   bank, the police arrest me before I get there.  I'm in the

14   park, I'm going to snatch a woman's purse, and I get

15   thwarted before I run away from them.  These are what we

16   understand as attempts under the law.

17       I think *Ferguson* really helps us focus on how serious

18   of an attempt was Mr. Genco's conduct.  Now, it was serious

19   and he is having some dark thoughts, and certainly he did a

20   lot of writings that were very dark and violent and serious.

21   However, one of the things the Sixth Circuit noted in

22   *Ferguson* -- and this is the last thing I want to point

23   out -- the defendant in that case, the government admitted

24   it did not know when *Ferguson* acquired his gear, and the

25   record demonstrates unequivocally that he had, at minimum,

1    owned his AR rifle prior to espousing his idea on

2    April 28th.  So the Sixth Circuit is focussing on the fact

3    that he didn't buy the gun as part of the plan, he already

4    had a gun.  That is exactly what we have here.

5        Okay.  If you go back to the government's filing,

6    sentencing memorandum, it indicated that he obtained all of

7    his gear January and February or in May, and his first

8    insult post is July.  Okay.  So again, this is not

9    purchasing a gun in relation to sub beliefs.  It's guns that

10   he already had and then he gets into these sub beliefs --

11   and they indicate in the filings and indictments -- in July

12   of 2019, that's how far back this was.

13       So in considering *Ferguson* in total, which we think is

14   a very important comparison, we ask the Court to keep that

15   in mind in deciding just how far down the line and how

16   serious this conduct was in relation to being an attempt.

17       Okay.  All right.  There's one other point I want to

18   touch on related to -- and to be clear, the government

19   indicated my client bought the tactile gloves, bulletproof

20   vest, hoodie, cargo pants, Bowie knife, and skull face mask

21   in January of 2019; the armory, the long rifle gun in

22   February; and the rest of the gear, Glock, magazines, clip,

23   holster, in May.  And then his first insult communication is

24   in July.

25       I want to mention one other point about the seriousness

1  of the conduct and that is the surveillance. The government

2  indicated in the indictment that my client conducted

3  surveillance at an Ohio university on January 15th, and this

4  is something they've kind of pointed to as to why this was

5  an attempt and why this is escalating. Specifically, the

6  government wrote on -- this is their government response in

7  opposition to our motion to dismiss, which was Document

8  No. 35. They wrote: Genco also conducted surveillance in

9  the location of a university in Ohio. IP records from his

10  e-mail account show him logging into an IP address on the

11  same day that he drafted a note that appears to detail his

12  surveillance of a school. An FBI tool showed the IP address

13  came back to Alliance Ohio, and I know you heard this in

14  pretrial filings. They believe or they've indicated in

15  writing in a filing that my client was surveilling a

16  university in Alliance, Ohio. The government further wrote:

17  A location over three hours away from his home in Hamilton

18  County, Ohio, where he was later arrested and his weaponry

19  and to-do list were discovered.

20      I'm going to tell you we don't believe there's any

21  evidence to support that that happened, that he went to

22  Alliance, Ohio, that he conducted surveillance at that

23  Mountain Union university. We challenge the government to

24  show you evidence that that's what my client did, that he

25  went to Alliance, Ohio and surveyed Mount Union university.

1    And we ask you, failing that, the standard is preponderance

2    of the evidence, which we've not seen it.  We don't believe

3    that you should be considering the surveillance at Mount

4    Union university.

5        All right.  Final thing I want to talk about this

6    morning --

7            THE COURT:  Take your time, Mr. Monahan.

8            MR. MONAHAN:  Yes, thank you.  -- is my client, you

9    know -- and I know I've saved this to the end, but it

10   probably is some of the most important part of what you've

11   got to consider and think about in deciding how big of a

12   variance he deserves.  And I want to talk about his history

13   and I want to talk about his rehabilitation, and I want to

14   mention the psychological evaluation that the Court has

15   already referenced.

16       As you know, Mr. Genco had, I think it's fair to say, a

17   strange childhood.  As you know from the psychologist and

18   from the state psych report, he definitely had a severe

19   mental illness.  The latest doctor has termed that bipolar

20   disorder, which is one of the big four of the serious mental

21   health problems.  He grows up with a mother who by her own

22   admission in her letter had mental health problems.  I think

23   she's opined to you that she believes her mental illness,

24   her father of Mr. Genco leaving their lives, and her being

25   left to raise him by herself, that that did not go very

1   smoothly.  His mother described herself as autistic,

2   agoraphobic, and suffers from severe PTSD due to horrific

3   abuse and homelessness that she suffered as a child.  She

4   collects Social Security Disability for her disabilities.

5       She raised him and she indicated -- and I think the PSI

6   supports -- that he was severely bullied as a child in

7   school, and the mother takes him out of school and

8   homeschools, which can work for some parents and kids, but

9   it does not sound like this was an ideal situation.  What he

10  actually ended up facing was complete social isolation

11  during his formative years.  He is severely stunted in his

12  social skills.  He had odd things they did, like having a

13  goat rescue farm, which my client enjoyed doing as a child,

14  but that was his, you know, contact with his mother and with

15  goats that they're raising on the farm.  His mother

16  indicated he was always kind to the animals.  He enjoyed

17  caring for them.

18      The one kind of work it appears his mother was able to

19  do was she had kind of a cleaning company that she ran

20  herself, and she was working on military installations just

21  doing cleaning.  That's indicated in her letter, and I

22  talked about this in the memo.  And my client would go with

23  her as a young person there when she was doing the cleaning

24  and as a result got to interact with some of the military

25  personnel, which actually was something that he developed a

1   dream early of possibly being a military person when he was

2   a young person and something he wanted to do when he got

3   older.  So these things are put into his head at this age.

4        Finally graduates homeschool and this is all out in

5   California.  He does a year of online college at Shasta

6   College in California.  Again, no social interaction when

7   you're having online school.  When he was 18, his maternal

8   grandmother passed away, and he and his mom receive an

9   inheritance, and that's what brings them to Ohio.

10       His mother makes the decision to move here to

11  Hillsboro, Ohio in 2018.  They have no family here.  They

12  know nothing of this community.  But his mother wanted to

13  get away from California, find a lower cost of living, find

14  a safer place to live than California, and they move to

15  Hillsboro, Ohio.  So Tres, already who suffered from severe

16  isolation, comes somewhere where he knows no one at age 18

17  and just has again his mother.

18       He had a very difficult time adjusting to the move.  As

19  I mentioned, he has no friends here.  It just further

20  fosters his isolation and social awkwardness.  So in 2019,

21  this is when he turns 19 years old, so -- and I want to

22  remind you, and I should be repeatedly reminding you of

23  this, this stuff, this incel sub belief and guns and all of

24  this stuff, he is a 19-year-old boy at this point, 19 years

25  old.  We are now, what, four years later in 2024, he's a

1     very different person sitting before you than a 19-year old

2     kid who came from that background of complete social

3     isolation.

4          You know, and this is a problem with this generation to

5     start, living their lives online, you know, phones and

6     computers, and then you take someone who has been completely

7     socially isolated and taken out of school and that's his

8     existence, is online.  So when you see these troubling posts

9     and internet searches, and, I mean, yes, they're -- for us

10    to look at this from the outside, it's certainly concerning,

11    but, you know, you take a human being's thoughts 24/7 and

12    the things they think about and the things they write down,

13    especially when they think they're in this harmless world of

14    the internet, I think it's just a perspective that we have

15    to have.

16         You know, the government is pointing to the three

17    things he wrote, the one-page note he wrote in Greece and

18    then this document he writes about "your helpful friend and

19    murderer."  You know, this is stuff he's writing.  He's not

20    sending it to anyone.  He's not threatening anyone with it.

21    These are things he wrote one day in Greece.  He's drunk

22    most of the trip, we've learned that now.  So it's hard to

23    judge someone's entire existence and their entire what they

24    planned to do based on a couple of isolated things they

25    wrote over a long period of time, especially when this whole

1    anonymous internet is his existence.  You know, that's where

2    he lived his life, and he said, you know, he's expressing

3    these dark views, just getting them out.  He's not fond of

4    the fact that he's having them, but this is where he was and

5    that's why he's pled guilty.  This is why he pled guilty in

6    state court and why he wanted to plead guilty here.  He's

7    admitting his part.  It's just how much punishment does one

8    deserve for this?

9        So we're here in Ohio, he's now turned 19 years old,

10   he's having these dark thoughts.  We know that his

11   grandmother passed away.  He's able to take some of that

12   inheritance money and he takes this fated trip to Greece.

13   It's the first time he's really been away from his mother in

14   his life.  Greece has an 18-year-old drinking age at that

15   time and he gets there and, oh, boy, he lays into the

16   alcohol heavy.  He writes the one-page note that we later

17   find -- the police later find at his house buried in a tub.

18   It's one page and it's the rambling thoughts he wrote down

19   while in Greece, which got retained and was found by his

20   mother later and then found by the police.

21       After he gets back from this trip, he's joining the

22   military, and I mention this was an idea planted in his head

23   at a young age, you know, that he thought he would join the

24   military.  And he goes in and he actually -- contrary to

25   what the government is suggesting -- hoped that the military

1    would kind of straighten him out, get him off of some of

2    these dark thoughts, get him into something that's a team

3    and something that he can believe in and learn from, and it

4    was the absolute opposite experience.  He's just like he was

5    at school, he's bullied.  He gets deathly ill with pneumonia

6    which causes him not to be able to keep up, and it's just a

7    traumatic event for him.  And he also realizes I don't want

8    to be carrying a gun around and shooting people in the

9    military, that was not something that appealed to him when

10   the thought of carrying a gun and shooting people hit him.

11   That's not to say that he still doesn't have dark thoughts,

12   but this was an experience that really kind of opened his

13   eyes, and he gets out of the military.  And we know now that

14   he has got undiagnosed bipolar disorder through all of this.

15   And he tries things like St. John's Wort, which was in the

16   file, and that actually may have been exacerbating his state

17   and contributing to his racing thoughts.

18        And during this time -- and I'm not going to hash all

19   of these out.  I attached them to the sentencing memorandum.

20   I know the government is going to show you some searches he

21   did.  But I also showed you some posts that he did where

22   he's having reservations about the incel movement.  Those

23   are attached as exhibits to our memorandum.  Back in August,

24   he wrote in a message team with a friend complaining about

25   how incels were prone to violence, he no longer wanted to be

1    involved with incels.

2        When we get around to January and he's back out of the

3    military, he's writing a friend that he deleted his Discord

4    app because he's developed as an individual and no longer in

5    incel, that was January of 2020, two months before his

6    arrest.  He's writing to a professor in Georgia who's doing

7    an article on incels identifying that Mr. Genco used to be

8    an incel, and he has developed, is no longer an incel.

9        So these are intermixed with some of the things the

10   government is pointing you to as to what he's doing.  So I'm

11   not saying he didn't have dark thoughts and I'm not saying

12   he continued -- didn't continue to have dark thoughts, but

13   it's not always clear.  This is not a person who knows what

14   he's doing and is focused on what he's doing.  This is a

15   person who's all over the place on what he should be doing

16   and what he should be believing, and he clearly needs help,

17   and he tries to get help.

18       You can see in the presentence report he goes to his

19   doctor, which is Adena healthcare.  They put him on a couple

20   of different medications to try to help him.  But he's

21   seeing a family practice doctor in a small town who I'm

22   estimating was not putting his thumb on the depth of Mr.

23   Genco's psychological problems, but he did try to get help.

24       Then, we come around to March and he's having arguments

25   with his mother and he's playing these violent video games

1     in his room, and he has these firearms that we know he

2     acquired a year before.  And the police show up and it's

3     kind of a domestic incident, and he gets arrested.  And this

4     is where the police discover this one-page letter that he

5     wrote in Greece in August of 2019.  What is that, seven

6     months earlier, eight months earlier at that point.  And, of

7     course, now this letter is a big deal because it does --

8     reading it, I'm not going to say it doesn't -- it sounds

9     like someone who's having this these kind of dark thoughts

10    about a shooting, but he wrote it eight months ago, and now

11    it's fresh to them because they just found it.  So he is

12    then arrested, and I think you now know the back end of the

13    story.  We know that he stays in custody and everything that

14    happens to him in the state court proceedings.

15         So we look at Mr. Genco as a whole person when we get

16    around to sentencing and not only what did he do, but where

17    is he now, what has happened with him since then.  He

18    started his rehabilitation in state prison.  He was out for

19    five months, I've already talked fairly extensively about

20    that, and then he goes back into federal custody and has now

21    sat there for two-and-a-half years.

22         You know that, you know, he's at the Butler County jail

23    this whole time.  There's only so much one can do at the

24    Butler County jail to try to better themselves.  That's an

25    unfortunate part of, you know, this existence, but he's two

1    years and seven months at Butler County now.  I think if you

2    look at, you know, this veterans program he's been involved

3    in -- you notice every time he shows up, he's in a khaki

4    shirt and pants, which is not inmate garb.  He's in this

5    MANA program which gives him a lot of freedom moving around

6    the jail.  He is a porter and does a lot around the jail,

7    laundry and those types of things.  He's in this MANA

8    program.  I sent a letter to you from the gentleman who runs

9    that program, sterling report of my client.  It's hard -- I

10   wish we could have had him in treatment the last

11   two-and-a-half years, but that's not an option at the Butler

12   County jail.

13        But what we suggest you should see is this -- and

14   really it's interesting to compare him to that defendant in

15   Jacques.  I submitted to you the series of letters and

16   communications that Jaques did out of that Butler County

17   jail, it's in the memo I filed late last night, letter after

18   letter threatening people and continuing his interest in

19   guns.  I mean, there's an evidence situation, perhaps,

20   that's very different than my client in terms of what is his

21   focus since he's been locked up.  This is a different person

22   than he was in March of 2020 when he was arrested, which at

23   this point is, if I'm counting, that's almost four years

24   ago.  I challenge the government or the Court to find a

25   single complaint about him since he was arrested in March of

1    2020, one bad incident of conduct, one bad thought, one bad

2    thing he wrote, one bad thing he said to another person,

3    anything that demonstrates he's still harboring these

4    beliefs.

5        In fact, look at the letters, and I know we submitted

6    to you a bunch of letters from inmates -- and the government

7    might say inmates, what do you expect -- but these people,

8    do you see this very much?  People say how nice he is, how

9    caring he is, how he's helping look after those that come

10   into the jail.

11       I want to point out I've got a mother and father here

12   in the second row, and I don't want to single them out too

13   much, but they're here because their son was locked up with

14   my client and I submitted letters to you earlier this

15   week -- I won't say their names in public, I don't think we

16   need to -- but you got their letters and now they're here

17   because they were so compelled by how my client helped their

18   son while he was locked up at that jail.  I mean, who does

19   this, who is this compelled by the kindness of an inmate to

20   travel all the way to Cincinnati for this sentencing because

21   they support him and what he did for their son while his son

22   was -- while their son was at the jail?

23       I mean, that's just one tidbit of who is this person at

24   his core and what is he becoming and why we can feel

25   confident he is never ever going to do this again, and that

1    he has learned his lesson.  He learned his lesson when he

2    was prosecuted the first time, and you can darn well bet

3    that he learned it when he is prosecuted for the same thing

4    the second time.  He is done with the beliefs.

5         The psychologist sees it.  And I know, you know, as

6    with everything else in the case, the government takes issue

7    with the psychologist as well and says he doesn't know what

8    he's doing and he didn't do the right testing, how could he

9    possibly know this guy from meeting him one time.  I would

10   inform them that most psychologists go meet the defendant at

11   the jail one time and they do a report and they interview

12   family and this is how the process works.  You know, we have

13   the state psychological evaluation which said he has a

14   severe mental illness.

15        We then have the doctor that -- actually, the Court

16   wanted another psychological evaluation; we got that done.

17   This doctor, he's an attorney and a psychologist, he comes

18   in and gives a very long, detailed, fair assessment of my

19   client.  And this is while, you know, right here at the end

20   of the process after he's been at the Butler County jail all

21   this time, and he got the evidence, he got the indictment,

22   he got the PSI.  He's able to see everything the government

23   is seeing in this defendant, and this is what he says, he

24   says, yeah, these were bad things and, yeah, he's got a

25   severe mental illness, and this is, you know, maybe a bad

1    concoction.  But looking at this Defendant and where he is

2    at this point in his life, he is, what, a low risk of future

3    harm if, as you pointed out, he'll deal with his mental

4    health and he'll deal with his what I think is an alcohol

5    problem.

6        That's compelling, right?  I mean, that's compelling

7    information.  If our goal -- you know, and we understand the

8    Court's concern, if I cut Mr. Genco a break, is he going to

9    turn around and be right back in the same spot.  You know

10    what, I don't know how much better evidence you could have

11    that he's not.  I don't know how much better evidence you

12    can have that he is not.

13        I think the bottom line at the end of this case is

14    really we're sitting here in the middle of an unnecessary

15    prosecution.  He's already duly prosecuted for this same

16    crime.  He got a sentence that was frankly in line with the

17    defendants that we've had got.  He got 17 months, that's not

18    out of line with what defendants are getting.  But, go

19    ahead, fine, add now he's sat in the Butler County jail for

20    two-and-a-half years.  He's already in the range of the

21    highest sentence we could find for an offense of this ilk.

22        Now, I know it's a big stretch to ask for time served,

23    and I get it, and I hear the Court saying we want you to do

24    some more time.  And we want you to consider this.  We

25    really appreciate the Court for looking at some of the

1    national statistics which are not out of line with where we

2    are today and certainly the local statistics support.  We

3    think the psych report supports that.  We think his behavior

4    over the last two-and-a-half years support that.  We think

5    the letters he received, the sentence he got in state court,

6    every single thing lines up to say this is enough.

7        And the government wants to complain about the cases

8    we've given you and complain about the psych report.  Well,

9    they've not cited you any other cases to look at, okay?  And

10   he's been sitting in custody for two-and-a-half years.  If

11   they have a problem with the psych report, they can ask for

12   one to be done at the BOP, which they've not done one time

13   in two-and-a-half years.  Okay.  So it's easy to sit back

14   and arm chair quarterback, oh, this is wrong, that's wrong,

15   we don't agree with that.  You know what, take the steps to

16   get the information you think the Court needs, because they

17   haven't done it.

18       So in sum, Your Honor, we ask you to consider a

19   sentence of time served in this case.  Enough is enough.

20   Failing that, failing that, if the Court deems that not

21   appropriate, certainly, we've given you plenty of

22   information of similar defendants in similar cases to

23   fashion an appropriate sentence.  With all of that in mind,

24   we ask the Court, as you've indicated, to downward vary to a

25   sentence of time served or whatever sentence the Court deems

1    appropriate.  Thank you.

2            THE COURT:  Thank you very much, Mr. Monahan.

3        Ms. Gaffney-Painter.

4            MS. GAFFNEY-PAINTER:  Thank you, Your Honor.  May I

5    approach the podium?

6            THE COURT:  Sure, please do.

7            MS. GAFFNEY-PAINTER:  And, Mr. Miller, I would like

8    to use the overhead projector, please.

9            THE DEPUTY:  Okay.

10            THE COURT:  Let me take this minute to thank the

11    couple who are here who came to support the Defendant.

12    That's extremely nice of you and it says a lot to the Court.

13            MS. GAFFNEY-PAINTER:  May I proceed?

14            THE COURT:  Yes.

15            MS. GAFFNEY-PAINTER:  Your Honor, earlier in this

16    proceeding, you gave a summary of all of the documents that

17    have been filed in advance of this sentencing.  Even as of

18    midnight last night, the second supplemental sentencing

19    memorandum was filed in this case.  And I don't wish to

20    belabor those documents, because I know the Court has read

21    them and considered them thoughtfully, but some of the

22    arguments made by defense counsel both here and in those

23    submissions I would like to respond to.

24        First, let's talk about the *Jacques* case out of Dayton.

25    Now, we highlighted in our submission to you how that case

1    is distinguishable from the case we have here.  And in his

2    response, defense counsel asserted certain things about that

3    case that are just simply not correct.  So, first, in the

4    government's sentencing submission, page 2 and page 20, the

5    prosecutors there are advocating for a significant sentence

6    of imprisonment, and having spoken to those prosecutors,

7    they fully intend to seek an upward variance in that case.

8    They are not bound to make a specific request in their

9    sentencing memorandum.  He asserted that under the law they

10    would be required to do that, that's simply not true, and

11    they have been advocating for a significant sentence in that

12    case.

13        And some of the relevant conduct that is referenced in

14    the government's submission and was argued here by defense

15    counsel I think would come as a surprise to Mr. Jaques'

16    defense counsel, who is also a federal public defender.

17    They are contesting vehemently a lot of that relevant

18    conduct, including the accusation of sexual assault in the

19    family and the accusation that there was a list.  The

20    government never found a list.  There was no list found in

21    the search warrant for that case.  Mr. Jaques on his YouTube

22    channel said I have a list of people that I want to, you

23    know, get back at, but that list has never been located.

24    And, in fact, defense counsel, the federal public defender's

25    office, is saying there was no list, it was merely a joke.

1          In that case, they had threats, very dire, scary

2     threats, a lot of very scary weapons, but what they did not

3     have was a plot.  They did not have a plan.  They had

4     someone shooting a laptop with a middle school sticker on it

5     saying that he was going to -- you know, wanted to target

6     that middle school.  But that middle school is located in

7     California and the defendant is in Dayton, Ohio, and they

8     found no evidence that the defendant was planning a trip to

9     California, that he had taken any substantial step towards

10     completing what he was talking about on the YouTube channel.

11     Instead, he was making threats and engaging in a lot of

12     scary behavior, but they didn't have an attempt.  If they

13     had an attempt, if they had the substantial step, they could

14     have charged it, they would have done something different.

15     What they could charge was possession of a machine gun and

16     so that's what they charged here.

17          THE COURT:  Somebody must have taken his threats

18     seriously, because the school board hired private help to

19     protect the school, so I think somebody believed his threat.

20          MS. GAFFNEY-PAINTER:  Oh, absolutely, and that was

21     a prudent decision on behalf of the school, to take this

22     YouTube video seriously, but what the school views as its

23     personal responsibility to the security of its students is

24     very different as to whether you can make out the elements

25     of an attempted murder charge here.  There was absolutely no

1    plan as far as they were aware, that there was no list,

2    there was no planned day.  Now, compare that to this case

3    where there is a written plan, a written to-do list that the

4    defendant prepared with a date certain, with a target, with

5    an outline for what he intended to do in the future.

6        Your Honor, this here is Government Exhibit D to our

7    sentencing memorandum.  So let's take a look at this.

8    Defense counsel wrote in the sentencing submission and

9    argued here today that these are just, you know, the drunken

10   ramblings of Mr. Genco when he's traveling to Greece.  But

11   that Greek trip -- he brought this letter home with him, he

12   kept it in his room, and even after his mother found it and

13   confronted him with it, he still kept it.  And why?  Because

14   he was working his way through this list.

15       Now, there was a lot of reference in the argument and

16   in the sentencing submission to the state charges in this

17   case.  And I want to be clear, the defense counsel said, you

18   know, it's duplicitous and that he was fully, completely,

19   and fairly prosecuted by the state.  Again, I think that

20   would come as a surprise to Mr. Genco's state defense

21   attorney who filed a motion to dismiss because he said that

22   writing a private note in your bedroom is not a threat.  A

23   threat has to be communicated.  It can't be a terroristic

24   threat if it's just a document.

25       And after he lost that motion to dismiss, Mr. Genco

1    entered an *Alford* plea.  I thought that the defense attorney

2    would consider that a fair prosecution.  And in the state,

3    this is what they had, this is what they had.  They didn't

4    have the breadth of evidence that we have.  They didn't

5    have -- there was so much evidence that the federal

6    investigation uncovered that they did not have when they

7    charged this.  The best they could do was making a

8    terroristic threat, and even Mr. Genco's defense counsel

9    thought that that was a stretch because it had never been

10   communicated.  Mr. Monahan referenced, you know, the

11   Defendant's postings, this was never posted, this was

12   private.

13       (Indicating.)  This was in his room and this was his

14   to-do list that he was following.  He brought it back from

15   his trip and he worked through it for months.  So let's look

16   at the first entry on this list here.  The C4H8Cl2S, law

17   enforcement believes that's the chemical composition of

18   mustard gas.  Not only does he have this mustard gas written

19   on this list, he does web searches for mustard gas in August

20   of 2019, and he wrote a note to himself on his phone that

21   one of his creation tasks was mustard gas.

22       Let's look at this next entry on this list, right

23   across, "OSU," believed to be a reference to Ohio State

24   University.  The day before his arrest, he saved a screen

25   shot to his phone of a web search he had done of police

1    scanner codes for the Franklin County Police Department that

2    would respond to any sort of attack at Ohio State.  He also

3    accessed Facebook pages for various Ohio State sororities.

4    This is not just a writing, a drunken rambling.  This is his

5    to-do list.  This is his guidepost.

6         (Indicating.)  Now, look here, "M-16 is optimal,

7    convert per mil spec."  So not only did he write that down,

8    but he researched online how to convert guns, and he in that

9    note -- the creation notes that he made to himself where he

10   mentioned mustard gas, he also mentioned making a "homemade

11   full auto," which we believe is a reference to making a

12   fully automatic weapon, which is what an M-16 would be, and

13   M-16 optimal but he can't get it, so he's going to get a mil

14   spec and convert it, like he said in his to-do list.  He did

15   it, he converted his AK-47 to an automatic through the

16   attachment of a bump stock.  And he took the gun that was

17   found in his room and he removed the rear rails and made

18   that an automatic weapon as well, that's a machine gun.

19   That is all after he joined the incel movement in at least

20   July of 2019.  He admits to joining in July of 2019, and

21   after that point, whenever he purchased the guns, he

22   researched how to modify them and he modified them.

23        Let's look at the list here.  "Will get arms training

24   in BCT Georgia."  Now, contrary to what defense just

25   represented, it doesn't say:  I'm going to join the military

1    because I want to be a part of a team, because I want to

2    learn how to control my dark thoughts.  He wants arms

3    training, that's why he's going there, and, in fact, he did

4    exactly what was on his to-do list.  He entered Army basic

5    training in Fort Benton, Georgia in between August of 2019

6    and December of 2019.  While he's there, he's not looking up

7    how to be a better teammate, he's not looking up how to

8    control my dark thoughts.  He's reading articles about mass

9    shootings.

10       After the part about the kill count where he's

11   intending to kill 3,000 people, question mark, he says:

12   "Need to write plot, take some writing classes," question

13   mark.  Well, we know that he followed through with that.  We

14   know that he wrote his manifesto in accordance with his

15   to-do list.  That's Government Exhibit E to the sentencing

16   submission.  This is not just a note.  This is not just

17   drunken ramblings.  This is his outline of steps that he

18   needs to take in order to accomplish his objective, the

19   objective that he admitted to in this court when he pleaded

20   guilty formulating a plot to kill women and intending to

21   carry it out.

22       And when we are talking about Federalism or debating

23   the merits of whether a state can bring a case or the Feds

24   can bring a case, we are distracting ourselves from the

25   facts of this case.  We are losing sight of what he admitted

1    to here and what the offense is that we're looking at.  This

2    is not a threat case.  This is more than a threat.  This is

3    an attempt.  He took substantial steps, the Court has

4    already found this.  He had a plot.  He wasn't just saying

5    he was going to do it, he was doing it.  And as you said

6    earlier in this proceeding, but for law enforcement, he

7    would have carried it out by his own admission.

8         I want to talk about the comparable cases in addition

9    to *Jaques*.  You mentioned the *Chan* case, the cyber stalking

10   case, and I would point out that, No. 1, cyber stalking

11   obviously is a different statute than what we're dealing

12   with here, but also it sounds like there was a single victim

13   in that case who was absolutely terrorized, but what we're

14   talking about here is a mass murder of potentially ideally,

15   according to his to-do list, in the thousands.  I mean, he

16   had modified his weapons to be efficient killing machines.

17   We are looking at a potential victim pool that is much

18   larger than a single victim.

19        In terms of *United States versus Koch*, I prosecuted

20   that case, as you mentioned, and I would note that we

21   requested the cross-reference and the application to the

22   guidelines.  We felt that that was just a brutal assault and

23   we should have cross-referenced away from the civil rights

24   guidelines in the applicable underlying offense.  Your Honor

25   chose not to do the cross-reference at that time, and so the

1      guidelines range for the hate crime was much lower than it

2      would have been had the assault been cross-referenced in

3      that case.  And as for his sentence of 30 months, the

4      government advocated for a much higher than that, and I will

5      note for the record that he never served that sentence.  He

6      fled the country after he was allowed to self-report, so he

7      still never served that sentence.

8              THE COURT:  The Court is aware of that.  That's the

9      only fugitive I have from a trial, but Judge Barrett has

10     Dr. Durrani, which I think is probably even more

11     significant.

12             MS. GAFFNEY-PAINTER:  Also, the *United States*

13     *versus Whitt* case, I prosecuted that case as well before

14     Mr. Barrett -- or excuse me, Judge Barrett, and he did

15     receive a sentence of 54 months.  We asked for more than

16     that when we sought his sentence.  But I will note that Mr.

17     Monahan represented that the attempted arson in that case

18     would have had a high likelihood of killing someone.  The

19     home where Mr. Whitt turned on the gas and put the candle

20     and ripped out the smoke detector was empty at the time.  It

21     was not occupied by anyone.  There was no -- of course, had

22     that fire caught, it would have caused extensive damage, but

23     there was no evidence in that case that anyone lived there.

24          So it is not on par with what we're talking about here,

25     which is actually murdering someone.  It seems that

1    Mr. Whitt's intention was to cause the destruction and fear

2    that he caused, but not necessarily to kill anyone.  And I

3    assure you that, if we had evidence that he was trying to

4    kill someone, we would have charged that.

5        He pointed Your Honor to the *United States versus*

6    *Ferguson* case in the Sixth Circuit.  I don't believe it's

7    worth much of the Court's time to have a legal argument

8    about whether this is attempt or not.  He's already pleaded

9    guilty to it.  But I will direct you to a page in that case,

10   this is on both 814 and 815, the Sixth Circuit found it

11   relevant that Ferguson had no timeline for his plan, let

12   alone an intent to execute it imminently.  As you know from

13   the to-do list, he had a date in mind.  There's the date

14   certain, May 23rd, 2020.  He's got a countdown, 290 days.

15   His web searches also show that he was counting down how

16   many days, how many days until May 23rd.

17       They also note in the *Ferguson* case that *Ferguson* never

18   provided a date or timeline for his plan.  He had no

19   location, no date or deadline, and not even a consistently

20   expressed goal regarding how he intended to carry it out.

21   Well, that's not this case.  We have a location, we have a

22   date, we have a plan, and we have steps, multiple

23   substantial steps taken towards executing that plan.

24       There is no comparable case here.  This is the first

25   hate crime prosecution of an incel in the entire United

1    States.  The reason you could find no national comparison is

2    because there isn't one, this is the first.  And an

3    intelligence analyst who researches extremists spoke to a

4    Cleveland newspaper recently and said that this, quote,

5    "would be a landmark case in gender-based violence, this is

6    the first."

7         And it's very important here for all of the reasons

8    that have already been articulated, but for some that are

9    not, to send a deterrence message to members of the incel

10   community about this hateful ideology and, should they take

11   steps to follow through with that ideology, that the

12   government will take it seriously.  And we know, we know

13   that the incels are looking at this case.  And how do we

14   know, because Your Honor received a letter on September 1st,

15   2021, from a group of interveners who called themselves

16   self-identified incels, and in their letter, they said,

17   quote, "we respectfully seek permission to intervene and ask

18   that the Court unseal and grant public access to two

19   exhibits."  And later in the letter, they said, quote:  "We,

20   the undersigned, are individual members of the public who

21   self-identify as members of the involuntary celibate incel

22   community.  The prosecution of the defendant is of great

23   interest to us and to the general public."

24        The unusual nature of the Defendant's alleged

25   activities and alleged affiliation with the incel community

1    have made national and international news.  This case is one

2    of the most prominent to date allegedly involving the incel

3    community.  There is a need for general deterrence.  This

4    sentence needs to provide general deterrence, and we have a

5    basis to conclude that the incels are watching, would pay

6    attention, and that it could have a deterrent effect.

7        But we not only need general deterrence, we need

8    specific deterrence here.  Mr. Genco filed a letter with the

9    Court, eight pages to the Court.  Nowhere in that letter

10   does he renounce his incel beliefs.  He doesn't even use the

11   word "incel."  In fact, the words he does use are quite

12   telling.  On page 3, he quote:  "At this time I came across

13   the community that would be my undoing and I wish never came

14   across.  When you're so low, you become vulnerable to the

15   allure of misery and want more than anything understanding."

16   Note that this is his description of the incel community.

17   It's a community, first of all, and also "understanding," he

18   felt he got understanding from these people and their toxic

19   ideology.

20       And there is no evidence anywhere in this record from

21   the psychologist's reports, from the defense counsel, that

22   Mr. Genco has been deradicalized.  He was immersed in this

23   philosophy.  He espoused it.  He believed it.  He planned an

24   active mass murder in furtherance of it, and nothing in

25   these reports or the submissions engages with this concept

1    in any way.  You can't just decide when you're this immersed

2    in this toxic-ness to just step away from it.  You need

3    serious intervention, you need deradicalization, and we

4    can't even have him engaging with the word, engaging with

5    the facts, engaging with the community that he was a part of

6    it.

7        This is not a threat case.  This is a case where we

8    need to engage with the actual facts, with the actual group

9    he was a part of, with the actual philosophy that they

10   espouse.  We can't look away from it.  And calling this a

11   threat case or comparing it to other threat cases really

12   minimizes the conduct here.

13       In his argument, Mr. Monahan said there's basically two

14   categories of offenses, those that are done and those that

15   are attempted and threatened.  I disagree.  Those are three

16   categories.  Attempt is its own category.  It should not be

17   lumped in with threats.  It is further down the road,

18   involves substantial steps, involves more commitment to the

19   threat.  It is not just about the subjective experience of

20   those that receive those words, but it's about actually

21   taking steps.

22       When we are looking to compare this case, instead of

23   comparing this case to other civil rights offenses, we

24   should consider comparing this case to domestic terrorism

25   cases because the incel movement presents a domestic

1    terrorism threat.  This has been recognized not only by the

2    FBI, but by numerous other organizations throughout the

3    world, that the incels are a terroristic group.  A court in

4    Canada found recently that they present a terroristic

5    threat.

6         A case that the Court could look to is *Chris Cornell*.

7    He was planning to do a shooting at the Capitol and was

8    arrested when he bought a gun and prepared to travel to the

9    Capitol.  He got 25 years.

10             MR. MONAHAN:  Judge, I don't believe these cases

11   have been cited in any filing by the government.  I mean --

12             THE COURT:  You're correct, you're correct.  Yeah.

13   The Court has not seen any evidence of these cases.  I think

14   if you wanted to cite them, there was plenty of time to file

15   them in all of the pleadings in all of the time you had.

16             MS. GAFFNEY-PAINTER:  Certainly, but two days ago,

17   defense counsel introduced a case from another district

18   prosecutor, you know, defended by their office, and so now

19   it's become quite relevant to come up with comparable cases.

20   The government's position is this is a landmark case, it's

21   in its own realm.  But if we need to compare cases,

22   comparing them to civil rights offenses about which, you

23   know, defense counsel didn't raise with, didn't raise *Koch*,

24   didn't raise *Chan*, it seems appropriate that I'm allowed to

25   respond with what I think would be a responsive case.

1          THE COURT:  I don't think it's fair, Ms.

2     Gaffney-Painter.

3          MS. GAFFNEY-PAINTER:  Okay.  I'm happy to move on,

4     Your Honor.

5          In the defense submission and today again, they call

6     Mr. Genco's writings "dark thoughts," and I want to talk

7     about what those dark thoughts are.  At one point, defense

8     counsel said there were only three writings; that's not

9     correct.  So let's actually engage with the dark thoughts

10    that we're talking about here.

11         Searching Mr. Genco's web history, e-mails, and text

12    messages, there were 3,487 items containing the word

13    "incel."  He posted over 450 times on an incel message

14    board, and I'd like to read some of those, a very small

15    selection of the numerous posts that he placed there.

16         Quote, "I sprayed some foids with three-week-old orange

17    juice unintentionally on ER's birthday."  That's a reference

18    to Elliot Rodger, the mass shooter.  "Their screams were

19    amazing.  They were mega Stacy's too.  Felt like I was

20    spiritually connected to the saint on that day.  I drove up

21    to them saying hi and they didn't even look up, they just

22    went huh-uh, so they get sprayed in the fucking face.  I

23    suggested to all incels, supremely inspiring action,"

24    unquote.  Quote, "ha-ha, what a cuck, he got a girl on his

25    dick and she's trying to inflate his micro penis, any normal

1    dude would have grabbed her by the hair and literally

2    slammed her face into it.  This sounds like a fake attention

3    whoring, teehee.  I am so cute and naive, but still a whore

4    story on the foids end," unquote.

5         THE COURT:  Where are these things that you're

6    reading from?

7         MS. GAFFNEY-PAINTER:  These are postings that he

8    made on the incel site, which are also cited in our

9    sentencing memoranda.

10        MR. MONAHAN:  If we could get dates that these

11   occurred so we can get a frame of reference.

12        MS. GAFFNEY-PAINTER:  These are outlined in our

13   sentencing memorandum submitted months ago.  These are

14   postings on incel.  I don't have the exact date, but they're

15   in the time frame that he identified as an incel.  He pled

16   to a certain date range.  All of the posts that I'm reading

17   now were outlined in the sentencing submission.

18        THE COURT:  All right.  I'll take your word for

19   that.

20        MS. GAFFNEY-PAINTER:  Quote, "I saw a husband

21   grabbing his wife by the shoulders and shaking her and then

22   slapping her in public while I was night walking at

23   3:00 a.m.  I didn't do shit about it.  Foid chose that fate,

24   ha-ha."  And then post quote, "revenge will be sweeter than

25   any woman," end quote.

1     He published a Kik message to a public group called

2     hashtag sociopathsclusterB.  In that, he wrote:  "I was in

3     an incel that got removed for saying I wanted to rape women.

4     I said I wanted to kidnap women and rape/murder them."  When

5     did he post that?  When he was in Georgia for basic training

6     getting that arms training that was on his to-do list.

7     He conducted numerous troubling web searches which

8     we've covered before, including, quote:  "When I see a

9     woman, I wonder what her head would look like on a stick."

10    And then he saved a number of disturbing pictures and memes

11    on his phone, a couple of which we admitted with our

12    sentencing submission.  This is Government Exhibit A to the

13    sentencing submission.  This is Adam Lanza depicted here who

14    was responsible for the Sandy Hook mass shooting.

15          MR. MONAHAN:  Was that "A"?  I'm sorry, I'm just

16    trying to hear.

17          MS. GAFFNEY-PAINTER:  "A."

18          MR. MONAHAN:  Thank you.

19          MS. GAFFNEY-PAINTER:  (Indicating.)  This is a

20    redacted version of the picture that was found on his phone.

21    This is attached to government's sentencing submission,

22    Government Exhibit B.  These are more than dark thoughts.

23    This is more than dark thoughts or even dark threats.  These

24    are dark plans.  He did dark plans.  The Court covered this

25    earlier in this proceeding outlining all of the steps both

1    in your order and in your oral recitation here to the

2    defendant of the steps that he took that showed he

3    absolutely, consistent with his plea, intended to carry this

4    out.  So we have these dark plans, the to-do list that he

5    was following.

6        We also have dark steps taken in furtherance of those

7    plans.  (Indicating.)  This is a photograph, this was

8    attached to the government sentencing submission, Government

9    Exhibit C, shows him modeling the mask.  Here he is posing

10   with his hands and the gun and the mask.

11       (Indicating.)  This is Government Exhibit G.  This was

12   attached to our sentencing submission.  This shows one of

13   the modified weapons.  This is the trunk of his car.  As

14   Your Honor pointed out in your order, this suggests that

15   this plan was imminent and he was preparing to execute his

16   plan.  And then there's another modified weapon, this was

17   found in his bedroom.  This is Government Exhibit H that was

18   attached to our sentencing submission.

19       By painting this as simply dark thoughts and making

20   arguments about Federalism and bringing up cases decided

21   after his plea about attempt, it's a walking back, it's a

22   walking back of what was admitted to here, and even his

23   submission to the Court attempts to explain away or walk

24   back what he did here.  In that submission, this is page 5,

25   he claims that the ADHD medication that he was placed on led

1    to, quote, "a cascade of blunders" one, quote, "which

2    resulted in the discovery of my long forgotten, I was

3    shooked to my core and recall breaking down crying in the

4    ensuing interrogation pleading that I had not intended to I

5    still plead and will to the end of my days," end quote.  But

6    that is directly in conflict with what he said here before

7    you under oath.  Quote, "Genco considered himself a member

8    of the incel movement.  Genco formulated a plot to kill

9    women and intended to carry it out."  As you wrote in your

10   order, quote, "although his admissions are enough, the Court

11   also notes that Genco took many steps that set forth in the

12   PSR."  "In short, he had acquired and prepared the means to

13   complete his plot, and having weapons and ammunition in his

14   vehicle suggests to the Court that he was getting ready to

15   act."  And, finally, very well said:  "His conduct is more

16   reprehensible than an attempted hate crime."

17        Even by the Court's recognition, this is a case in and

18   of itself.  This is not comparable to an attempted hate

19   crime; it is more reprehensible.  And the seriousness of

20   this crime, set aside everything else, if we just focused on

21   the 3553(a) factor that is about the seriousness of the

22   offense, just that alone is sufficient to support the

23   presumptively reasonable cap proposed here by the parties,

24   which is 150 months; that is middle of the guidelines here.

25   A variance is not warranted.  The crime alone, but we also

1    have all of the other factors, including general and

2    specific deterrence, and including no recognition at any

3    point of the true depth of what the Defendant was engaged in

4    and what he planned.  There is just minimisation from start

5    to finish, except in his plea agreement.

6         For all of these reasons and the reasons outlined in

7    our numerous submissions, Your Honor, we submit that no

8    variance is warranted here and sentencing him to the

9    presumptively reasonable middle of the guidelines 150-month

10   sentence is what's warranted by this conduct.

11        THE COURT:  Thank you, Ms. Gaffney-Painter.

12        Mr. Monahan, if you're going to be a while, do you want

13   a break first?

14        MR. MONAHAN:  I don't need one.  I can probably be

15   done in about 5 minutes, Judge.  I just have a few points.

16        THE COURT:  Okay, that's fine.

17        MR. MONAHAN:  Let's leave that on, Bill.  I

18   actually want to put an item up.

19        I want to correct a few things that I do think are

20   important to be corrected.  Ms. Gaffney largely dismissed

21   paying attention to the state case because she said that

22   they didn't have the evidence in the state that we have

23   federally, and I believe she even said the words they had

24   "no forensic evidence."  I believe that to be completely

25   untrue.

1          I obtained the discovery that the state attorney had in

2     state court.  They actually had the FBI Domestic Terrorism

3     Case Mobile Device Extraction and Analysis, which was

4     prepared April of 2020.  That was one month after his

5     arrest.  That was five months before sentencing.  I think

6     that that was just an inaccurate statement to the Court.

7          I'm also going to point out that in this packet that I

8     received, we have the mask that was found in the phone.  We

9     have the picture she just showed you as an exhibit found in

10    the phone in April of 2020.  We have the gun picture.  We

11    have the unfortunate picture of the two naked women with the

12    gun on a bed.  These are pictures she just showed you acting

13    like this is new evidence they have.  They had this in state

14    court, they had it in April of 2020.

15         It is simply not correct that the state didn't have all

16    of the evidence.  They had all of the same things she's

17    showing you today in a forensic report prepared in April of

18    2020, so please don't pay attention to that distraction.

19         The Greece list, the one-page list she showed you with

20    the handwriting, that was written in August of 2019.  It is

21    one page.  We know he was largely incarcerated (sic) on that

22    trip, that was September, October, November, December,

23    January, February, March, seven months before his arrest,

24    nine months before the May date.  There was a one-line about

25    a May date in that letter, nine months before that.

1    Remember what *Ferguson* said, Government, show me one case

2    where an attempt has been supported by something that had

3    happened more than a month before the incident.  Nine

4    months.

5         The hideous symphony document that she showed you that

6    was typewritten and put on the overhead, that was written,

7    according to the indictment, on August 3rd of 2019, again,

8    seven months before arrest, nine months before May, while

9    he's in Greece.  So again, yes, they're bad-sounding

10   documents, I'm not telling you they don't sound bad, just

11   consider the context and the time frame in which they were

12   written.

13        And now fast forward to he's doing -- he's writing

14   messages that the government found in his phone that he's no

15   longer involved with incel, he's trying to get away from

16   incel, he doesn't like how violent these are.  These are not

17   self-serving messages he's telling you.  These are things

18   that he has written and that they found in his phone.  They

19   could argue to you it's self-serving.  Incel isn't even in

20   his mind anymore.  He didn't write about incel because it's

21   not a part of his life anymore.

22        I have to mention the *Whitt* case.  Ms. Gaffney-Painter

23   again minimized the *Whitt* case and she actually said the

24   words to you:  Well, the candle being lit with the gas being

25   left on and the smoke detector being pulled out, she said

1      that was an apartment that was abandoned at the time so it

2      had no risk of hurting anybody.  I just wanted to read you

3      what she wrote in her sentencing memo about that.  "An

4      African American male returned from Thanksgiving vacation to

5      check on his two-family property on Seton Avenue in Price

6      Hill.  What he encountered at the Price Hill house was an

7      exceedingly disturbing crime.  Cans of paint were splattered

8      on the walls, stairs and appliances.  Large holes were

9      beaten in walls.  The stairwell bannisters were broken.  The

10     carpet was torn.  Quikrete had been poured in the drains and

11     toilets.  The plumbing traps were removed from two sinks and

12     the water was left running causing the ceiling to collapse.

13     The floor sustained water damage and the basement flooded.

14     A butcher knife was menacingly stabbed in the floor."  The

15     gas stove on the second floor unit -- again, acknowledging

16     this is one of the two units in the building.  I'm not sure

17     how this didn't risk hurting somebody.  "The gas stove to

18     the second floor unit was left with on with a candle next to

19     it while the smoke alarm above had been ripped off the

20     ceiling.  Spray painted anonymous -- I'm sorry, ominously on

21     the walls were the messages -- and I pardon me for the

22     language, I'm just reading it, I'm just going to say die

23     with the "N" word, the "N" word written several times, white

24     power, slum lord, and swastikas.

25          So again, her interpretation of the facts at the time

1    of the case is significantly more egregious than her

2    interpretation of the facts here before you.  And I'm not

3    sure how a two-family dwelling where this was on the second

4    floor, that won't be a risk of harm to someone, even if that

5    particular apartment wasn't occupied at the time.

6            MS. GAFFNEY-PAINTER:  Your Honor, just as a point

7    of clarity, neither apartment was occupied.  And I, of

8    course, stand by everything I wrote in that sentencing

9    submission.  That crime was incredibly disturbing, deserved

10   a significant sentence, but it wasn't attempted murder.

11           MR. MONAHAN:  She read you a bunch of posts, I

12   don't know what those dates were.  I'm speculating they were

13   way back in August of 2019, but it's impossible to tell.

14   Maybe it was in Greece, I don't know.

15       I think after listening to all of that, a comment to

16   make is Mr. Genco in all of this never actually encountered

17   a woman.  He never threatened a woman.  He never interacted

18   with a woman.  He did all of this stuff in his imaginary

19   online world.  It's still disturbing and it's still wrong,

20   but just keep that perspective.  It's one thing to go do a

21   crime, it's another thing to talk a lot about doing a crime

22   and think about doing a crime, which is what he did.  I'm

23   not trying to, you know, candy coat this more than it can be

24   candy coated, but I do want to point out that the man never

25   encountered a woman.  He didn't share any of these thoughts

1    with a woman.  No victim knew that he had these thoughts,

2    not one.

3        Finally, I want to say the government kind of finished

4    telling you that a sentence within the guideline range is

5    presumptively reasonable, and I've heard prosecutors say

6    this before.  I want to be very clear, that is an appellate

7    standard, that is not the standard that a district judge

8    applies.  I have to consider the guidelines to be

9    presumptively reasonable.  What you must do is determine a

10   sentence that is sufficient but not greater than necessary

11   to meet the statutory purposes of sentencing, and I didn't

12   want that indication about presumptive reasonableness to

13   sway you in any way because, candidly, that's not what this

14   Court considers.

15       I have nothing further to add.  I do want to remind

16   that Mr. Genco does need to be afforded an opportunity for

17   allocution and that I am completed with my presentation.

18           THE COURT:  Okay.  I'm sorry, did I not give him an

19   opportunity?

20           MR. MONAHAN:  Yes, we never got back to him

21   actually to allocute.

22           THE COURT:  I apologize.

23           MR. MONAHAN:  Which is fine, we were going to do it

24   last anyway.

25           THE COURT:  Yes.

1          MS. GAFFNEY-PAINTER:  Your Honor, may I have a

2    brief moment to respond just to a single point raised in Mr.

3    Monahan's presentation?

4          THE COURT:  All right.

5          MS. GAFFNEY-PAINTER:  He said that at no point

6    during this case did Mr. Genco encounter a woman, and, as

7    you know, that's not correct.  This whole case came to our

8    attention because he threatened his mother.  His mother

9    heard him cocking a gun in his room and he had threatened to

10   harm her, and she called 911 to report it.  So he did

11   encounter a woman, she did feel fear, and that's how this

12   case started.

13         MR. MONAHAN:  He was not even charged with domestic

14   violence, to my knowledge, so that could have been a state

15   misdemeanor domestic violence charge, but that was never

16   pursued.  So, yes, he encountered his mother daily, we would

17   certainly submit that that's true.

18         THE COURT:  Okay.  Mr. Genco, I'm sorry, anything

19   you would like to say, sir?

20         THE DEFENDANT:  Yes, Your Honor.  Am I supposed to

21   stay at the podium?  I don't know.

22         THE COURT:  You can do it from wherever you're most

23   comfortable.  If you're most comfortable sitting, fine.  If

24   you want to stand at the podium, that's fine too.

25         THE DEFENDANT:  Thank you.  I want to kind of

1  reference something for the sake of interpretation.  I

2  didn't want to be misinterpreted.  I completely disavow

3  incel in any way, shape or form; I have from even before

4  when was I was arrested.  So I just wanted to kind of

5  reference that.  If I didn't properly reference that, that's

6  a failure on my end.

7       Your Honor, to be before you today is my recognition of

8  the deepest remorse, my greatest mistake, and also the grief

9  upon which I inflict on those who I am blessed to call loved

10  ones, friends, and family.  This mistake is mine, I

11  acknowledge fully.  But I will not worsen it by failing to

12  recognize this and let it evolve into a life-long collapse

13  of responsibility.  What I thought and wrote in delusion

14  feels completely foreign to me.  It is wrong in so many ways

15  and is a betrayal to the person I've been all my life.

16       I'm so sorry for my actions and how I've affected

17  others.  This remorse has hurt me more than any brick wall

18  or cold steel in this whole experience.  Never will I permit

19  the circumstances that have made the sun and sky stranger to

20  me, never will I neglect and ignore my mental health again.

21  My ignorance resulted in exponential pain and grief not

22  conceivable in delirium, but painfully clear in sobering

23  hindsight.  The misery I have experienced has given way to

24  clarity and perspective, and reflection has given me a

25  life-long dedication to being the helping hand I wish I had

1    in the past.

2         Your Honor, I implore you in only the way whose fate is

3    in your hands may that you do not see me for the boy I was,

4    but the man I am today.  I am pleading for the opportunity

5    for redemption.  Any chance I may have to develop, whether

6    it be referencing my mental health with therapy or

7    furthering my education or working as I was in the halfway

8    house, you will see me work vigorously.  My aspiration is

9    that I may live a life that reflects empathy and compassion

10   in every facet and to live a life that reflects love for

11   this world.

12        I feel like while a lot of the situation has been about

13   me and about the mistakes I've made, but I've also hurt a

14   lot of people coming here.  I've hurt my family.  I've hurt

15   friends.  I've -- of course, if I've caused any anxiety or

16   stress to people, I just want to apologize.  And that's all,

17   Your Honor.  Thank you for listening.

18             THE COURT:  Thank you very much, Mr. Genco.

19        Anything else?

20             MR. MONAHAN:  No, Your Honor.

21             MS. GAFFNEY-PAINTER:  No, thank you, Your Honor.

22             THE COURT:  We're going to take a 10-minute break.

23             THE DEPUTY:  All rise.  Court is now in recess

24   until 12:15.

25        (Recess taken from 12:07 p.m. to 12:23 p.m.)

1          THE DEPUTY:  All rise.  This court is now in

2     session pursuant to the recess.  Please be seated.

3          MR. MONAHAN:  Do you want us at the podium?

4          THE COURT:  You're fine there.

5          MR. MONAHAN:  Thank you, Judge.

6          THE COURT:  As you all know, this case has been

7     pending for a long time, and that was primarily because this

8     was an extremely serious allegation and I wanted to make

9     sure that everything was completely investigated.  I wanted

10    to find out more about Mr. Genco's mental health, and the

11    opinion of the doctor was helpful.  I have given this a

12    tremendous amount of thought already.  When I compare him to

13    the national statistics, I feel that the sentence I'm about

14    to pronounce is comparative to those.  Mr. Genco's

15    allocution, I find him very sincere, one of the most sincere

16    statements I've ever heard.  I'm also impressed with the

17    couple who is here whose son he befriended, that says a lot

18    about the kind of person he's become.

19         This is a unique case, but I think I come out where the

20    doctor who last examined you came out, that I believe in

21    your rehabilitation and I think you have been and will

22    continue to work on it.  We judges wish we had a crystal

23    ball and know how these things come out, but we don't.  So

24    we have to make our best judgment.

25         So it's the duty of the Court to sentence the Defendant

1    at this time; however, counsel will have a final chance to

2    make legal objections before the sentence is actually

3    imposed.  And for all of the reasons I've just mentioned --

4    let me find one thing here.

5         (Pause.)

6         I've looked at the guidelines.  Mr. Genco is currently

7    a 33, I.  If I go back to a 30, which is still a very

8    significant amount of time, instead of being a 135 to 168,

9    the sentence would be 97 to 121 months, and I feel that's

10   much more in line with the national statistics than the

11   suggestion of what a 33 is.

12        For that reason, and pursuant to the Sentencing Reform

13   Act of 1984, and 18 U.S.C. Section 3553(a), it's the

14   judgment of the Court that Mr. Genco is hereby committed to

15   the custody of the United States Bureau of Prisons -- I

16   would give you, Mr. Genco, a 97-month sentence, which is

17   what you would get if you were -- if the crime were a 30,

18   which is very significant offense, and Criminal History I,

19   but since you served already 17 months for exactly the same

20   conduct, I think you should get credit for that time.  I

21   know the Bureau of Prisons would not give you credit for

22   time that you served in state custody.  I often do this, if

23   the Bureau of Prisons is not going to give credit for the

24   time served in state custody for exactly the same conduct, I

25   deduct that from the sentence that goes to the Bureau of

1    Prisons.

2        So you were in state custody for 17 months.  I'm

3    deducting that from the 97, so I come up with a final amount

4    of 80 months.  And that would be if this were an offense

5    level of 30 instead of a 33, which I don't think is much of

6    a variance.

7        Upon release, you shall serve a term of supervised

8    release of five years, which is also another way to build in

9    some security that you will continue to keep your mental

10   health up.  Within 72 hours of release from imprisonment,

11   you must report to the probation office in the district to

12   which you are released.

13       During your term of imprisonment, the Court believes

14   you would benefit from mental health treatment, vocational

15   training, and an apprenticeship program.

16       While on supervision, you must not commit another

17   federal, state or local crime.  You're prohibited from

18   possessing a firearm, ammunition, destructive device, or

19   dangerous weapon.  You must not unlawfully possess a

20   controlled substance.  You must refrain from any unlawful

21   use of a controlled substance.  The Court finds a low risk

22   of future substance abuse on the part of the Defendant; and,

23   therefore, pursuant to 18 United States Code Section 3583D,

24   the Court is waiving the requirement of mandatory drug

25   testing.  You must cooperate in the collection of DNA as

1    directed by the probation officer.

2         And you need to comply with the standard conditions of

3    supervision that have been adopted by this court as well as

4    the following special conditions.  First, you need to -- you

5    should participate -- the Court is going to order that you

6    do participate in a program of mental health assessment

7    and/or counseling as directed by the United States probation

8    office until such time as you are released from the program

9    by the probation office.  You shall make a copayment for

10   treatment services not to exceed $25 per month, which will

11   be determined by your ability to pay.

12        Second condition is that you shall participate in a

13   vocational services program as directed by the probation

14   officer, and this is all when you get out from prison.  Such

15   program may include on-the-job training, job readiness

16   training, and skills development training.  I think you'll

17   be in the custody of the Bureau of Prisons certainly for

18   enough time to be able to take one or two apprenticeship

19   programs.  So you'll have the opportunity to learn something

20   that you can do that you can use as for employment on the

21   outside.

22        It's ordered that you shall pay a special assessment in

23   the amount of a hundred dollars, which is due immediately.

24        And, finally, the Court considers the sentence to be

25   just and reasonable in light of the Defendant's conduct and

1    the applicable sentencing factors.

2         I have some questions, Mr. Genco, I want to ask you.  I

3    can make a recommendation as to which prison facility you be

4    sent to.  Normally, it's a geographic recommendation, like

5    closest to Cincinnati, but if for some reason, you want to

6    go to another institution that has different apprenticeship

7    programs or whatever, I can request that.  The Bureau of

8    Prisons does not have to follow my recommendation, but they

9    generally try to do so, if they can.

10        MR. MONAHAN:  He did, Judge, actually do some

11   research related to programming that he might be interested

12   in.  And he would like you to recommend either Milan, which

13   is Michigan, M-I-L-A-N, Michigan, or Elkton, E-L-K-T-O-N.

14        THE COURT:  Wait, say that again.

15        MR. MONAHAN:  Elkton, E-L-K-T-O-N, Ohio.

16        THE COURT:  Yes, I'm familiar with Elkton.  The

17   Court will recommend Milan, Michigan, or Elkton, Ohio.

18        I'd also like to recommend that you participate in any

19   type of apprenticeship program that's offered by the Bureau

20   of Prisons.  Do you want me to make that recommendation?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  Is there a particular apprenticeship

23   program you want me to recommend you for?

24        THE DEFENDANT:  If there's a possibility for any

25   college credit or courses, I'd be grateful to have that

1    opportunity.

2         THE COURT:  I'll put that in there, you know,

3    college courses, if possible, if available, in addition to

4    the apprenticeship program.

5     I also want to recommend one more thing.  I know I've

6    recommended mental health counseling when you get out of

7    prison.  I'd also like to for you to have mental health

8    counseling during the time you're in the Bureau of Prisons,

9    and so I'm going to put that in the judgment and commitment

10    order.

11     Mr. Monahan, do you have any objections as to why this

12    sentence should not be imposed as stated?

13         MR. MONAHAN:  We're not -- we're going to add

14    nothing.  I mean, you heard all of our presentation earlier

15    today and why we thought the sentence we requested was

16    appropriate.  I would comment that probation and the PSI

17    actually recommended credit for the state sentence, so we

18    appreciate you considering that and awarding that time.

19         THE COURT:  Yeah.  And I always do that, I think,

20    you know, when somebody is serving time for exactly the same

21    conduct, they ought to get credit for that, and I know the

22    Bureau of Prisons doesn't give credit for state sentences,

23    so I always do.

24     Ms. Gaffney-Painter, do you have any objections?

25         MS. GAFFNEY-PAINTER:  Well, first, a point of

1    clarity.  You mentioned going from a 33 to a 30; is that a

2    departure or a variance, Your Honor?

3            THE COURT:  A variance.

4            MS. GAFFNEY-PAINTER:  A variance, all right.  The

5    government does have objections to the sentence.  First, we

6    lodge an objection under 18 U.S.C. 3553(a)(2).  We also

7    lodge an objection under Title 18 United States Code

8    Section 3553(a)(6).  And we also lodge an objection to the

9    determination that making a terroristic threat in state is

10   the exact same crime as an attempted hate crime.

11           THE COURT:  Would you explain what 3553(a)(2) and

12   (a)(6) are?

13           MS. GAFFNEY-PAINTER:  Sure.  3553(a)(2) involves

14   the seriousness of the offense and also the deterrence that

15   must be considered when evaluating the sentence.  (a)(6) is

16   to avoid unwarranted sentencing disparities.

17           THE COURT:  Okay.  Thank you.

18        All right.  I need to advise you of your appellate

19   rights, Mr. Genco.  Under some circumstances, you have a

20   right to appeal a sentence.  However, a defendant may waive

21   that right as part of a plea agreement, and you have entered

22   into a plea agreement which waives some or all of your

23   rights to appeal the sentence itself.  Such waivers are

24   generally enforceable, but if you believe the waiver itself

25   is not valid, you can present that theory to the appellate

1    court.  If you're indigent and cannot retain a lawyer, you

2    may apply and one will be appointed to represent you on your

3    appeal.  You're further advised that, in accordance with the

4    provisions of Rule 4B of the Rules of Appellate Procedure,

5    you must file your notice of appeal with the clerk of the

6    United States District Court within 14 days of the filing of

7    this judgment.

8         The Court does hereby advise you that, if you so

9    request, I can order the clerk of courts to prepare and file

10   immediately a notice of appeal on your behalf, or I can ask

11   Mr. Monahan to protect your appellate rights.  Would you

12   like me to ask Mr. Monahan to do that?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  All right.  It's further ordered that

15   you need to notify the United States Attorney for the

16   Southern District of Ohio within 30 days of any change in

17   resident or mailing address until the special assessment of

18   $100 imposed by this judgment is fully paid.

19        Are there any other objections?

20             MS. GAFFNEY-PAINTER:  No, thank you, Your Honor.

21             MR. MONAHAN:  We have no further objections, Your

22   Honor.

23             THE COURT:  Okay.  Thank you, everyone.  Mr. Genco,

24   good luck to you.

25             THE DEFENDANT:  Thank you, Your Honor.

1          THE DEPUTY:  All rise.  Court is now in recess

2     until 2:00.

3          (Proceedings concluded at 12:37 p.m.)

4                 **C E R T I F I C A T E**

5          In accordance with 28 U.S.C. Section 753, I certify
      that the foregoing is a correct transcript of the record of
6     proceedings in the above-entitled matter prepared from my
      stenotype notes and that the transcript page format is in
7     accordance with the regulations of the Judicial Conference
      of the United States.

8          /s/          *Lisa Conley Yungblut*          *03/13/2024*

9          LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25