**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 1:21CR85 |
| vs. | : | |
| TRES GENCO, | : | Judge Dlott |
| Defendant. | : | |

**MR. GENCO'S SURREPLY TO GOVERNMENT'S REPLY**

The government seeks to evict Mr. Genco from a residence that was preapproved by the Probation Office, in a city and in a community where the government itself placed him after his term of imprisonment, and where Mr. Genco has been living productively and harmoniously since his release from prison. In addition to seeking his eviction from his home in violation of the law, the government urges this Court to impose a sweeping, state-wide "two-mile residency restriction," prohibiting Mr. Genco from living within two miles of any Ohio college or university because of "serious safety concerns." As discussed in this sur-reply, there are no legitimate public safety concerns with Mr. Genco residing where he lives, and it is abundantly clear that the government's arbitrary two-mile restriction is not about public safety but about optics. This Court's decision-making must be guided by the actual facts and the actual law, not by optics, not by emotion, and not by the fear that has been stoked by the government's motion to evict Mr. Genco from his home.

1. **THE FACTS**

**Mr. Genco did not lease his apartment to be intentionally provocative and unsafe.**

Counsel for the government told this Court that Mr. Genco's "residence choice seems to be intentionally provocative and unsafe." (Doc. 83, PAGEID 3863). This is a false and intentionally inflammatory premise.

Mr. Genco did not choose to live where he is living.[1] He was deposited in ███████, Ohio, and ordered to complete his sentence in a halfway house in downtown ████████, by the Federal Bureau of Prisons, which is a government and law enforcement agency operating under the Department of Justice. Thus, it is the government that chose to place Mr. Genco in the ████████ metro area, not Mr. Genco himself.

Fortunately, as it turns out, this location was a good choice for Mr. Genco. Since August of 2025, Mr. Genco has been residing, working, dining, socializing, attending religious services and on-line classes, all in downtown ████████ without issue.

After a successful period of residing in the government-chosen transitional housing in downtown ████████, Mr. Genco was directed to find an apartment so that he could live independently. As the Court will surely appreciate, it is no easy task to find affordable housing under the best of circumstances, let alone as a convicted felon leaving transitional housing. The evidence shows that Mr. Genco applied for apartments outside of and within the city of ████████, reflecting that he bore no strong feeling about remaining in the ████████ area. The uncontested evidence shows that his application for distant housing was denied (his understanding is that it was denied because of his felon status) and that he chose the apartment on ██████████ because it was a viable, affordable option. After consulting with his Probation Officer, after providing his

---

[1] While nearing the end of his term of incarceration, Mr. Genco filled out a form requesting that he be released to an address in Waverly, Ohio.

Officer with an address and a copy of the lease for the now-contested apartment, and only after getting the Probation Officer's permission, Mr. Genco moved forward with securing the apartment at issue. Defense Exhibits A, B, C, D1 and D2 (filed as attachments under seal to Doc. #84) unequivocally show that the government's inflammatory supposition that Mr. Genco moved to ███████ and selected an apartment near campus to be "intentionally provocative and unsafe" is flat wrong.

### Mr. Genco is residing farther away from campus than registered sex offenders.

In its reply, the government argued that Mr. Genco's apartment is too close to College 1 and—purportedly for the sake of student safety—Mr. Genco must not only be evicted from his home but also prohibited from living within two miles from all college and university campuses throughout Ohio. (Doc. #83, PAGEID #940).

As discussed in Mr. Genco's response in opposition to the government's motion, residency restrictions are typically seen in the context of sex offenses, because state legislatures have determined that prohibiting a convicted sex offender (regardless of the victim's age) from living within 1,000 feet of a school is important to public safety. Here, of course, no such mandate applies to Mr. Genco: Mr. Genco did not commit a sex crime, and he is not a sex offender. Therefore, no residency restrictions or registration requirements apply to his crime of conviction, i.e., the nature of his crime does not require that he reside a certain distance from the target of his offense, or schools or playgrounds or places where children and students frequent.

But, as indicated in the exhibits filed herewith under seal, even if Mr. Genco's crime were as egregious as a sexually motivated act of predatory violence requiring that he register as a sex offender under Ohio law, he would be residing lawfully where he is now: An apartment at ███

3

████████████, ██████, Ohio, is located where registered sex offenders can lawfully reside.[2] And many do. At the Ohio Attorney General's OffenderWatch,[3] which offers sex-offender mapping and information to the public, the Court can see that Mr. Genco is actually living *farther* from campus than registered sex offenders in his neighborhood.

Nowhere in its 10-page reply brief (Doc. #86) does the government engage with the elephant in the room or answer the necessary question: How does the modification it seeks actually serve to protect the public? The government provided no rationale grounded in facts, evidence, or law for its initial motion, despite that the burden to do so sits squarely on the government. Its reply is similarly deficient.

As discussed below, effective public safety measures are those that promote, support, and sustain rehabilitation, not those that ostracize and diminish people. Absent a satisfying answer to the necessary question regarding public safety, which must be supported by facts and evidence, not fear, the Court must conclude that the government's request for Mr. Genco's eviction and a 2-mile ban is not rationally related to the goal of protecting the public.

## 2.  THE LAW

The government asks this Court to find that Mr. Genco's track record of absolute compliance during and after his prison sentence is "irrelevant" for purposes of the modification that it seeks. This ask is contrary to the law and the facts, and it must be rejected. As the Court well-knows, the government cannot lawfully wield its power to evict law-abiding, restored-citizens from their lawfully-situated homes and force them to live arbitrary distances away from whomever or whatever institution is uncomfortable.

---

[2] *See* Exhibits G1 (0.25-mile radius), G2 (1-mile radius), G3 (2-mile radius).
[3] https://www.icrimewatch.net/index.php?AgencyID=55149

**A.** **The Court must consider Mr. Genco's current circumstances, his post-offense rehabilitation, and his history of compliance on supervised release in its analysis.**

The government incorrectly asserts that Mr. Genco's post-offense conduct is irrelevant in the Court's analysis of the appropriateness of the modifications it seeks. Not only is his post-offense conduct relevant, *the Court is required to consider and account for it*. Esteras v. United States, 606 U.S. 185 (2025)(prohibiting the use of "backwards-looking" sentencing ends and requiring courts to be "forward-looking" when fashioning the terms and conditions of supervised release). This makes sense since "[s]upervised release 'is not punishment in lieu of incarceration.' Rather it 'fulfills rehabilitative ends' and 'provides individuals with post-confinement assistance.'" Id. at 186. (internal quotations omitted)

Thus, in determining the lawfulness of an eviction order and a geographical ban, the Court cannot, as the government argues, simply ignore that Mr. Genco requested and received permission to live where he resides, ignore the positive steps Mr. Genco has taken to rehabilitate, assimilate, and mature, ignore his stellar conduct in prison and beyond, and ignore his conscientious compliance on supervision thus far. Indeed, the very facts the government dismisses as irrelevant are, according to no less an authority than the Supreme Court, the facts that "provide[] the most up-to-date picture of" whether the defendant:

> will engage in future criminal conduct, a central factor that district courts must assess when imposing a sentence … [To that end, the defendant's] exemplary postsentencing conduct may be taken as the most accurate indicator of 'his present purposes and tendencies and significantly to **suggest the period of restraint … that ought to be imposed** upon him.'

Pepper v. United States, 562 U.S. 476, 492 (2011) (internal citations omitted) (emphasis added).

5

When the Court considers the facts here (and disregards the inflammatory speculation), the most up-to-date picture of Mr. Genco's "present purposes and tendencies" is that Mr. Genco has engaged in successful rehabilitation and has taken careful steps to ensure he can continue on his reformed, law-abiding path.[4] Nothing about his post-offense conduct could support the restraint the government asks this Court to impose. To the contrary, Mr. Genco's post-offense conduct has been exemplary and leads to only one conclusion: The terms of supervision that the government sought and the Court imposed at the time of sentencing were appropriate and not greater than necessary to effect the goals of sentencing.

**B. <u>Evicting Mr. Genco from his apartment and banning him from residing within two miles of any college or university in Ohio involves a greater deprivation of liberty than is reasonably necessary.</u>**

Conditions of supervised release must involve no greater deprivation of liberty than reasonably necessary to accomplish the goals of supervised release. <u>United States v. Bates</u>, 804 Fed. Appx. 345 (6th Cir. 2020); <u>United States v. Kreuger</u>, 18 Fed. Appx. 847 (6th Cir. 2020); <u>United States v. Williams</u>, 356 F.3d 1045, 1049 (9th Cir. 2004).

Evicting and banishing an individual compliant on supervision necessarily involves "a greater deprivation of liberty than reasonably necessary" where less restrictive conditions are in place and effectively achieving the compliance being sought.

The Sixth Circuit has evaluated residency restrictions only in the context of a supervised release violation (a situation not present here) and, according to the government, only on three

---

[4] Indeed, Mr. Genco is simply no longer the teenager who was drawn into the online subculture that promotes misogyny and is now a conscientious, mature adult, who is committed take the right steps in forging a new path for himself. Yes, Mr. Genco's original crime was a serious one—no one denies that—but six or seven years have passed since Mr. Genco rejected Incel ideologies, and he has not looked back and instead has actively and proactively engaged in real rehabilitation and reform.

occasions. In each of the three cases cited by the government (where, it must be underscored, a violation had occurred), the residency restriction was affirmed only after less restrictive conditions were unsuccessful in preventing the violative conduct that brought the defendant before the district court. See e.g., United States v. Alexander, 509 F.3d 253 (6th Cir. 2007) (after defendant's initial violations, court modified defendant's conditions with the consent of all parties; following additional violations after the first modification, court held a revocation hearing and imposed a geographical restriction because of, and in direct response to, the defendant's repeated violations); United States v. Rantanen, 684 Fed. Appx. 517 (6th Cir. 2017) (after repeated violations, modifications, and revocation hearings, the defendant himself suggested he should be barred from returning to his home county and the court obliged by imposing a banishment condition; the defendant later had "buyer's remorse" and appealed to the Sixth Circuit, which affirmed under a plain error review); United States v. Meshigaud, 815 Fed. Appx. 965 (6th Cir. 2020) (after being placed on supervised release, the defendant violated his conditions by drinking and committing domestic assault; after admitting the alcohol use, the court imposed a restriction that prohibited the defendant from entering two counties and a reservation without the permission of his probation officer; on appeal, the Sixth Circuit affirmed the restriction because it was imposed in direct response to the inefficacy of the more narrowly tailored condition).

Here, the government points to no failure, error, or violation on the part of Mr. Genco during his 80-month sentence and the 10 months he has resided in ███████ to justify the modifications it seeks. Absent violations, Alexander, Rantanen, and Meshigaud do not provide legal support for ripping Mr. Genco from his home and forcing him to live a random two miles away from every college or university in Ohio.

Further, while the government argues that the two-mile restriction will not significantly infringe upon Mr. Genco's freedom of movement, it once again ignores the real-life implications of its request. According to the Ohio Department of Higher Education's website,[5] which counts only public institutions, the state of Ohio houses 14 universities with 24 regional branch campuses, 24 community colleges, and more than 70 adult workforce education and training centers statewide. These colleges, universities, and adult education programs serve almost 600,000 students statewide in these public institutions. Id. The government's request would encompass private institutions, too, which are not reported on Ohio's Department of Education's website but could include another 60 or more institutions. When counting for-profit and trade schools, the number is even higher, touching nearly every city in Ohio.

The government in its reply argues that it is not seeking a "broad exclusion" that would bar a defendant from "living in a particular county or even a city. Rather, the requested condition is tailored to provide an appropriate buffer between the defendant's residence and the victims chosen by the defendant, namely university campuses and specifically, College 1." (R.86, Govt. Response, PAGE ID #947). But that is not what the government actually asks of this Court. Far from being "appropriate," as illustrated by the map below,[6] the geographical ban would significantly infringe upon Mr. Genco's ability to move and live within the state of Ohio, in violation of the Constitution. See Kolender v. Lawson, 461 U.S. 352, 358 (1983)("The right to travel from one place to another free of hindrances is a well-established aspect of constitutionally protected private freedom.")

---

[5] https://highered.ohio.gov/about/ohios-campuses
[6] Id., pinpointing only public institutions, including public universities, regional campuses, community colleges, and Ohio technical centers.

8



Given that Mr. Genco is fully compliant with his conditions of his supervised release, there is simply no basis to support this sweeping infringement on his fundamental rights.

### 3. **THE SOLUTION**

In its reply, the government seems to recognize that an eviction and a residential restriction is a legally unsound proposition because it suggests alternative modifications, such as a condition imposing electronic monitoring. But the use of electronic monitoring, in the absence of a violation or any wrongdoing on Mr. Genco's part, is also "greater than necessary" to accomplish the goal of protecting the public. Even defendants with more egregious underlying crimes aren't made to wear ankle monitors throughout their term of supervised release in the absence of violations of supervision. An ankle monitor would be even more stigmatizing than the geographical ban because everyone who encounters Mr. Genco would see the clunky electronic cuff around his ankle and perceive him to be a threat and a danger at a time when he is to be supported in his reintegration

9

into the community. He is already subject to a ban prohibiting him from entering College 1's campus (which, given its size, encompasses a massive swath of ███████), and he has not violated this condition.

The bottom line is that Mr. Genco has already agreed to the least restrictive and rationally-related condition by consenting to computer and phone monitoring, which involves an extensive level of oversight. In 2019, at the time of his offense conduct, his internet searches provided the most accurate indicator of his thought processes and criminal intent. Since Mr. Genco's underlying offense was inextricably linked to his online activities, a condition that tracks his phone and computer usage makes sense.

On May 26, 2026, computer monitoring software was installed on all of Mr. Genco's electronic devices based on his consent. This modification allows the Probation Office to track Mr. Genco's internet activity, search history and activity, his associations, and all of his communications with others. Indeed, Mr. Genco's phone and computer are all being monitored now, and the Probation Office has confirmed that Mr. Genco is not engaged in concerning online activities, associations, or communications with others.

Unlike the geographical ban and ankle monitor, computer and phone monitoring serves to mitigate the risk of harm to the public because it readily identifies any relapse in problematic thinking, while properly balancing Mr. Genco's liberty interests. While the target of Mr. Genco's offense conduct from many years ago involved a college campus, his crime originated with his online activities. Focusing on the campus now is a facile, optics-based, and ineffective approach to public safety, but the implementation of computer monitoring is not. Computer monitoring is the most effective, and least restrictive, way to protect the public, and Mr. Genco has already agreed to that.

10

In addition to computer monitoring, the Court already ordered Mr. Genco to participate in counseling, which means that, in addition to the excellent supervision that the Probation Office provides, he will also has mental health professionals keeping tabs on him. These conditions combined with the ban prohibiting Mr. Genco from entering campus without permission, the prohibition on weapons, and the subjection of unannounced searches and seizures at any time, serve to achieve the goals of supervision.

Wherefore, based on the foregoing, as well as Mr. Genco's initial response, the defense respectfully asks the Court to deny the government's motion to further modify his conditions of supervised release. As the Court can fully appreciate, the government's ask to evict Mr. Genco from his apartment is the beginning of a very slippery slope and would implicate countless other supervisees. The government's request runs counter to the foundational principles of sentencing in this country, is wholly unsupported by the law, and it must be rejected.

Respectfully submitted

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

*s/ Karen Savir*
Karen Savir (KY 92002)
Assistant Federal Public Defender
250 E. 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorney for Defendant
Tres Genco

11

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Tim Mangan, Assistant United States Attorney, via Electronic Case Filing, on this 17th day of June 2026.

*s/ Karen Savir*
Karen Savir